Ronald Edward JOHNSON and Rita Johnson, Appellees-Appellants,

v.

WOMAN'S HOSPITAL and William Pallas, M.D., Appellants-Appellees.

Court of Appeals of Tennessee, Western Section.

Feb. 12, 1975.

Certiorari Denied by Supreme Court Aug. 11, 1975.

Strang, Fletcher, Carriger, Walker & Hodge, Chattanooga, for Woman's Hospital, appellant-appellee.

W. A. Moody, Nashville, for William Pallas, M. D., appellant-appellee.

Robert J. Shockey, Chattanooga, for appellees-appellants.

NEARN, Judge.

The plaintiffs filed suit for the recovery of damages, both compensatory and punitive, for breach of contract to bury, and for the alleged outrageous conduct of the defendants. The jury returned a verdict against both defendants in favor of Rita Johnson for the sum of $100,000 compensatory damages and $125,000 punitive damages. Ronald Johnson, the husband of Rita Johnson, was awarded the sum of $75,000 as compensatory damages in his claim for his wife's medical expenses, etc. and consortium.

Motions for a new trial were seasonably made by both defendants. After hearing the motions the Trial Judge suggested a remittitur of $75,000 from the jury award for punitive damages and a remittitur of $50,000 from Mr. Johnson's compensatory award.

The plaintiffs accepted the remittiturs under protest.

The judgment as finally entered below is in the amount of $50,000 for Mrs. Johnson as punitive damages; $100,000 to her as compensatory damages and $25,000 to her husband Ronald Johnson.

Both the defendants and the plaintiffs have appealed. The error assigned by the plaintiffs is confined to the remittitur. The Assignments of Error of the defendants total twenty-nine.

An understanding of our treatment of this appeal requires a comprehension of the nature of the causes of action involved.

The complaint alleged that the relationship of physician-patient existed between Dr. Pallas and Mrs. Johnson as Dr. Pallas was attending her during her pregnancy. The childbirth was expected in September 1972, but sometime prior to June 1, 1972, Mrs. Johnson began having difficulties with her pregnancy and was twice hospitalized;

primarily for observation and bed rest. On June 1, 1972, she experienced bleeding and was again placed in the defendant hospital. On June 9, 1972, she gave birth to a child which was in the sixth month of term. The premature infant expired shortly after birth. Both a certificate of live birth and a death certificate were issued.

The complaint further alleged that plaintiff

"—had a contractual agreement with defendants for the birth of her baby and for post delivery care. That within the scope of this contract defendants agreed to take the responsibility for the proper and permanent disposition of plaintiffs' child. This included not only a responsibility to fulfill their obligation to the body of the child, but more so a responsibility to see that a young mother grieved by the unfortunate death of her child would have the peace of mind and assurance that her baby's body was put to rest. Plaintiff avers that in failing to timely notify her of defendants' inability to fulfill part of their obligation they mutilated her right to the aforementioned mental security."

The complaint also alleged that Mrs. Johnson had understood that her baby would be given repose provided by the defendants which would be consistent with common traditions of human dignity. However, when she visited Dr. Pallas for her six weeks checkup she noted a pathologist report which was attached to her medical chart. The report stated that the fetus was past the fifth lunar month in development and hospital rules and State law prohibited disposal of it as a surgical specimen. The complaint alleged that Mrs. Johnson was shocked at the contents of the pathologist report and asked the meaning thereof from Dr. Pallas as she had understood that the body had been disposed of by common traditions of human dignity. Dr. Pallas instructed his nurse to take Mrs. Johnson to the hospital to see a Mrs. Chaney. Mrs. Johnson was taken across the way to the hospital where she

"—was led to a section of the hospital where a freezer was opened and she was handed a gallon jar of formaldehyde with the discolored and shrivelled body of her child floating inside."

Dr. Pallas denied that he or his nurse took any part in the display of the body in the jar of formaldehyde. The hospital denied that the display took place in the manner alleged. Dr. Pallas also denied the existence of any contract to bury or dispose of the body of the infant between himself and plaintiffs. The hospital denied any contract to bury the infant, but alleged that the hospital had only agreed to dispose of same as a surgical specimen, if possible.

The complaint further charged that,

"—defendants' failure to act within the limitations granted them relative to her child and their wanton, willful and inhuman display of the child's body to her afterwards were violations of both her legal rights and common decency and amounted to outrageous human conduct."

Special issues were submitted to the jury. Among other things the jury was asked if plaintiff was entitled to recover on (a) "Outrageous conduct theory" or (b) "Theory based upon agreement to dispose of immature baby's body."

The jury answered that recovery was based on both of the above theories and held both defendants liable for compensatory and punitive damages.

As now may be seen both from the pleadings and the manner in which the case was submitted to the jury, plaintiffs sought recovery of damages arising out of contract and damages arising out of tort.

We will at this point consider the majority of the 15 Assignments of Error made by the defendant hospital. Those not now treated will be considered along with the Assignments of Error of Dr. Pallas.

■ As its second Assignment of Error counsel for defendant hospital charges the Trial Court with error in overruling the defendant hospital's motion for a directed

verdict made at the conclusion of plaintiffs' proof. This Assignment of Error is overruled. The motion was waived when the defendant hospital elected to adduce its proof after the motion was overruled. *Railway and Light Co. v. Henderson* (1906) 118 Tenn. 284, 99 S.W. 700.

■ The fourth Assignment of Error is that the Trial Court erred in overruling the defendant's motion for a separate trial on the issues of outrageous conduct and contract theory. Rule 18 of T.R.C.P. provides for the joinder of contract and tort claims in a single action. We are unable to perceive any valid reason why these two claims should not have been tried together. The Trial Judge did not abuse his discretion and the Assignment of Error is overruled.

The fifth Assignment of Error is that the Trial Judge erred in charging the jury on the theory of outrageous conduct. In support of this Assignment of Error it is argued that there is no such thing as the tort of outrageous conduct in this State and even if there is the proof failed to show such tort and the charge on the subject was meager and insufficient.

■ The tort of outrageous conduct is recognized by this State. See *Medlin v. Allied Investment Co.* (1966) 217 Tenn. 469, 398 S.W.2d 270. The remainder of the argument on this Assignment is addressed to the alleged failure of proof, or error in the charge, which are the subject of other Assignments of Error and will be treated in their place. Accordingly, the fifth Assignment of Error is overruled.

By its sixth Assignment of Error the defendant hospital faults the Trial Judge for charging the jury on the contract theory of liability. The argument in support of this Assignment of Error is actually an argument to the effect that there is no evidence of a contract between the defendant hospital and the plaintiff and is in fact a duplication of another Assignment of Error. This argument will be considered with the Assignment of Error which complains that there is no evidence to support a verdict. Accordingly, the sixth Assignment of Error is overruled.

The seventh Assignment of Error faults the Trial Court for failing to charge the legal defenses to a contract which defense had been pleaded by the defendant hospital.

The record reveals that prior to the actual charge being given, the Court and counsel had a general discussion regarding the possible contents of the proposed charge. The attorney for Dr. Pallas requested the Trial Court to charge the essential elements of a contract to which the Trial Judge responded "Request denied. I've told you what I am going to charge. Now you can make your requests at the end." At this point counsel for the defendant hospital stated:

"Before we go on, I want for in behalf of Woman's Hospital, and I'd like to have this on the record at this time, since you have advised us of your charge—that we do object on behalf of defendant Woman's Hospital to *any* charge on *any* grounds sounding in contract." Emphasis ours.

In view of the foregoing we find it difficult to reason why counsel should not be permitted to cry "error" for the Trial Court's alleged failure to charge "the legal defenses" to contract. The reasoning is made even more difficult when the record shows that the defendant hospital did not request in writing, or for that matter orally, any special instruction on the subject of contract, although given ample opportunity.

■ Therefore we hold the defendant hospital may not now be entitled to complain of the alleged meagerness of the Court's charge on the "legal defenses" to a contract. However, we have carefully read the Court's charge and we believe it sufficiently instructs the jury as to what must be found as fact by them before there can be liability on the defendant's part on the contract theory.

The seventh Assignment of Error is overruled.

The eighth Assignment of Error faults the Trial Court for charging both the contract theory and outrageous conduct theory of liability. The argument presented with this Assignment of Error is just a reargument of the argument submitted with the fourth Assignment of Error which has been heretofore overruled. Accordingly, the eighth Assignment of Error is overruled.

The ninth Assignment of Error alleges error on the part of the Trial Judge in failing to grant five special requests of the defendant hospital. We find no argument in the brief regarding the first special request. Therefore we will not consider same. It is argued that Special Request No. 2 should have been given as it is believed that it better defines outrageous conduct than does the general charge of the Court. We do not concur in counsel for appellant's belief. Primarily, because we view Special Request No. 2 as erroneous.

Special Request No. 2 in part contains this verbiage.

"I have previously charged you upon the liability of a defendant for negligence. [This the Trial Court had not done.] Outrageous conduct is not merely negligence on the part of the defendant, but it must go beyond negligence."

In this case, in so far as outrageous conduct is concerned, the subject of negligence has no place. Negligence is characterized by inadvertence. A negligent or inadvertent act will not give rise to a claim of outrageous conduct. See *Medlin v. Allied Investment Co., supra.* It has never been contended that the hospital inadvertently displayed the baby in a jar of formaldehyde to Mrs. Johnson. It is admitted in the proof that the display was exactly what was intended. The question then arises whether or not that intentional display under all the circumstances amounted to outrageous conduct as that tort is defined in the *Medlin* case.

The balance of Special Request No. 2 contains various statements of what out-

rageous conduct is not. The Trial Judge used the language of the *Medlin* case, *supra,* in positively defining the elements of the tort of outrageous conduct. He was not required to attempt to negatively charge the matter and committed no error in refusing to charge Special Request No. 2.

The gravamen of Special Request No. 3 was adequately contained in the general charge and there is no proof to sustain a charge of Special Request No. 4. The fourth special request was a request to charge the jury that there is no State law, rule, or regulation that requires a fetus to be buried or prohibits the disposition of a premature fetus as a surgical specimen. Whether or not there is any such State law, rule, or regulation and under what circumstances they apply if they do exist we do not know, except by statement of counsel in his brief which will not suffice. No competent proof was adduced at the trial to the effect that no State law, rule, or regulation (which statement covers a world of printed material) requires a fetus to be buried or prohibits the disposition of a premature fetus as a surgical specimen.

Special Request # 5 is the definition of reckless conduct as found in § 500 *Restatement of the Law* 2d, Torts and such request was refused by the Trial Judge with the notation that such charge was contained in the general charge.

One is subject to tort liability for severe emotional distress when he engages in outrageous conduct, which conduct intentionally or recklessly causes such severe emotional distress. *Medlin v. Allied Investment Co., supra.* This was charged to the jury. In describing the tort of outrageous conduct to the jury, the Court stated that in order to be outrageous, such conduct must have been

"—so extreme in degree as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

"Liability clearly does not extend to mere insults, indignities, threats, annoy-

ances, petty oppression, or other trivialities. Rather, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim outrageous."

By their verdict, the jury found the conduct complained of to be of such extreme degree as charged by the Court. A finding of such described conduct is a finding of the factual elements necessary for finding of reckless conduct as defined in *Restatement*. While we are of the opinion that Special Request # 5 was proper, we think that its essence was included in that part of the general charge above set out and we do not find reversible error in the failure to give such special request.

Accordingly, the ninth Assignment of Error is overruled.

The tenth, eleventh and third Assignments of Error of the defendant hospital are all to the effect that there is no evidence to support a verdict. We will now consider those Assignments of Error along with the corresponding Assignments of Error of Dr. Pallas.

Consideration of these Assignments of Error requires that we review the proof in the light most favorable to the plaintiffs and draw all reasonable conclusions therefrom in plaintiffs' favor. *Sullivan v. Morrow* (1973 Tenn.App.M.S.) 504 S.W.2d 767.

Such review would warrant the following facts.

Because of difficulties encountered in carrying her child to term, Mrs. Johnson was placed in the Woman's Hospital under the direction of her physician, Dr. Pallas for observation and treatment. While so confined she delivered a six and a half month old infant which expired sometime within an hour or so after its birth. After the death of the infant, the hospital floor nurse, a Mrs. Howell, inquired of Dr. Pallas what should now be done. Dr. Pallas advised Mrs. Howell that the disposal of the infant body was a matter for determination by the Johnsons and for Mrs. Howell to so advise the Johnsons that the disposal could be handled either by the hospital or burial by the Johnsons. Mrs. Howell did not relay this information to the Johnsons but simply told Mr. Johnson for neither he nor his wife to worry about the matter as the hospital would properly take care of everything.

Mrs. Johnson was upset by the loss of the child as she strongly wanted a little boy which was the sex of the deceased infant. The hospital had permitted her to see the body of her infant shortly after it died and the infant was perfectly formed. Mr. Johnson thought his wife disturbed enough over the death of the infant and accepted the offer of the hospital to properly handle the final disposition of the body by taking care of everything. Mrs. Johnson was discharged from the hospital with instructions to visit Dr. Pallas in six weeks.

Mrs. Howell then took the infant's body and placed it in a jar of formaldehyde and forwarded same to the pathology laboratory for disposition as a surgical specimen.

The pathology laboratory returned the body in the jar of formaldehyde to the hospital with the notation that because of the size and age of the fetus it could not be disposed of as a surgical specimen. The pathologist report was attached to the medical chart of Mrs. Johnson.

Mrs. Johnson returned to see Dr. Pallas at the end of six weeks. It is the policy of Dr. Pallas' office that patients waiting to see Dr. Pallas for their six weeks checkup be given their medical chart for delivery to the Doctor when called in his examination office. While awaiting her turn to see the Doctor Mrs. Johnson noticed the pathologist's report which stated the body could not be disposed of as a surgical specimen. Mrs. Johnson did not know the meaning of the notation as she thought the hospital had buried or decently disposed of the infant's body. She made inquiries of the nurse of the meaning of the notation and was referred to Dr. Pallas for an answer. Dr. Pallas advised Mrs. Johnson to see Mrs.

Chaney at the hospital about the matter and instructed his nurse to accompany her there.

At this point Mrs. Johnson knew nothing of the condition of the infant body, its whereabouts, or its manner of preservation. Upon seeing Mrs. Johnson, Mrs. Chaney exclaimed that she had been looking for her and that she had her infant's body and that it had been preserved. Mrs. Chaney then took Mrs. Johnson, accompanied by Mrs. Baker, the nurse of Dr. Pallas, back to a refrigerator, opened the door, took out the jar of formaldehyde containing the floating, shrivelled body of her infant and handed it to Mrs. Johnson. Subsequent to this occurrence Mrs. Johnson suffered from nightmares, insomnia, and depression when around children. In addition, Mrs. Johnson suffered from pseudo-pregnancy which caused pelvic pain and nausea. As a result exploratory surgery was done and eventually psychiatric treatment was administered and will have to be continued for an indefinite period.

■■■ From the foregoing account of events given in the light most favorable to the plaintiff, we hold there is evidence from which a jury could find that the defendant hospital agreed to properly handle the infant's body and that the defendant hospital failed to do so and in fact mishandled the body. In other words, there is proof that could warrant a recovery against the hospital based on the contract theory. The failure to perform a contract to properly handle a dead body is actionable in this State. See and compare *Taylor v. Bearden* (1915) 6 Tenn.Civ.App. 33; *Phillips v. Newport* (1945 M.S.) 28 Tenn.App. 187, 187 S.W.2d 965.

■■ As to the outrageous conduct theory we hold that there is evidence from which a jury could find that the conduct of the defendant hospital in displaying the infant in the manner and under circumstances described was outrageous conduct as defined by our Supreme Court in the *Medlin* case, *supra,* and that such conduct recklessly caused severe emotional distress to plaintiff Mrs. Johnson. We are of the opinion that a recitation of the foregoing facts could be considered to cause the exclamation of "outrage!" from the general community.

Therefore Assignments of Error of the defendant hospital are overruled.

We are unable to discover any proof from which it could be said that Dr. Pallas ever agreed to do anything in regard to the disposition of the infant body or that the plaintiffs expected Dr. Pallas to in any manner dispose of the remains. All the plaintiffs' proof on the contract theory is that a contract for burial was entered into between the plaintiffs and the hospital.

■■■ It is true that Mrs. Johnson and Dr. Pallas were contractually related in so far as the doctor-patient relationship is concerned. However, proof of such relationship is not proof of a contractual relationship to dispose of a dead body. A doctor does not become a mortician except by special contract. Counsel for appellee argues that Dr. Pallas in some manner became a party to the contract when nurse Howell asked him what to do after the death of the infant. In effect all the doctor told Mrs. Howell to do was to talk to the plaintiffs and find out what they wanted to do. Nurse Howell was not the agent of Dr. Pallas at this point. She was acting for the hospital. The hospital had a dead body on its hands and was obligated to do with it whatever the next of kin wished. Again, the doctor was under no duty to dispose of the body and there is no proof that he ever assumed such duty.

Neither the doctor nor his nurse, Mrs. Baker, displayed the infant in the jar to Mrs. Johnson. The display of the infant is the gravamen of the outrageous conduct theory of the case. There is no proof in this record that either Dr. Pallas or nurse Baker knew of the condition of the body of the infant. As far as we are able to ascertain only three people knew, before the display, that the baby was floating in a jar of

formaldehyde viz.: Mrs. Howell who placed it in the container, the pathologist who received it (and his report does not state the condition of the body or its manner of preservation) and Mrs. Chaney who received it from the pathologist. The plaintiffs' proof shows that Dr. Pallas instructed her to see Mrs. Chaney and that Mrs. Baker went with her to see Mrs. Chaney. There is no proof from which it can be said that Mrs. Baker, who was the agent of Dr. Pallas, intended to display the body in such manner to Mrs. Johnson. The proof is that the three of them went to the refrigerator, Mrs. Chaney opened it and gave the jar and baby to Mrs. Johnson. As we observed in our treatment of the hospital's ninth Assignment of Error, if an act be negligently done, as opposed to intentional, there can be no tort of outrageous conduct. The defendant hospital intended to display the infant in a bottle of formaldehyde to the plaintiff. There is no proof that such was the intent of either Dr. Pallas or his nurse.

We therefore hold that there is no proof from which it can lawfully be said that Dr. Pallas or his nurse are guilty of the tort of outrageous conduct. There is no proof from which it can be concluded that their intent was to do the act complained of or for that matter that either of them knew it was going to happen.

The result is that we are of the opinion that the Trial Judge should have directed a verdict for the defendant Pallas on both theories at the close of all of the proof and that Assignment of Error is sustained.

We now return to the appeal of the defendant hospital.

The twelfth and first Assignments of Error are to the effect that punitive damages are not permissible in this type of case and the verdict is excessive.

In answering these Assignments of Error it should be borne in mind that we actually have two types of cases at hand. One in contract and one in tort.

Under the contract theory of the case punitive damages are not allowable and the Court so charged the jury. The general rule is that punitive damages are not recoverable in a contract action and neither are damages for mental anguish, since it is not in tort and there is no physical injury. See *Corbin on Contracts*, §§ 1076, 1977. However, Tennessee has long permitted the recovery of substantial damages for mental suffering alone in the breach of a contract to bury or embalm a body. See *Taylor v. Bearden, supra.* The older Tennessee cases simply held that in such contracts, the natural and expected results of a breach are emotional disturbances. Therefore, based on the rule that such damages were reasonably expected by the parties, damages arising out of contract for emotional disturbances were approved even though the action was in contract and there was no physical injury. See *Telegraph Co. v. Potts* (1907) 120 Tenn. 37, 113 S.W. 789; *Taylor v. Bearden, supra.* Some of our sister states (see Annotation 48 A.L. R.3d 261) and some later Tennessee cases, (see *Hill v. Travelers Ins. Co.* (1926) 154 Tenn. 295, 294 S.W. 1097; *Dutto v. Cemetery* (1917) 8 Tenn.Civ.App. 120) have attempted to get around the general rule of no recovery for emotional disturbances by such legal fictions as the trespass of the property rights of the next of kin in the body of the deceased. These fictions are likely to deceive no one but a lawyer. The old reason, that is, damages naturally expected by the parties, is the logical, understandable and just reason for allowing the exception in these exceptional cases.

In this case the Trial Judge properly charged the jury that they could only award compensatory damages for the mental anguish suffered for the mishandling of the dead body. We will later discuss the amount of the award.

In the charge on outrageous conduct, the Trial Judge advised the jury that punitive damages could be awarded on the tort theory of the case. We hold his honor was correct. Our brother Judges in the State of

Illinois have held to the contrary. See *Knierim v. Izzo*, 22 Ill.2d 73, 174 N.E.2d 157. The Illinois Court stated:

"Since the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive."

While we respect the opinion of the Illinois Court we do not agree with the logic of its reasoning. Compensatory damages are just that. Such damages compensate for actual loss. They should contain no element of "smart" money. Mental anguish is a suffering just as the pain associated with a broken arm is a suffering. In a proper case for punitive damages, where the physical injury was a broken arm and a jury awarded compensatory damages for the pain and suffering associated with the broken arm, as well as punitive damages; we do not believe a Court would be warranted in disallowing punitive damages on the theory that the compensatory award for pain and suffering is sufficiently punitive. To do so eliminates the concept of punitive damages.

It would seem to us that the Illinois Court has mistakenly equated mental anguish and suffering with punitive damages. The two are not the same no more than physical suffering and punitive damages are the same.

Neither, in our opinion, is the fact that "the outrageous quality of the defendant's conduct forms the basis of the action" any legal reason for disallowing punitive damages. In the ordinary punitive damages case, the willful and wanton conduct of the defendant forms the basis of the punitive damages action, but that is certainly no reason to refuse to allow punitive damages. It constitutes the reason why such punitive damages are allowable.

In short, we simply are unable to conceive of any logical reason why punitive damages are allowable in cases of willful and wanton conduct but would not be allowable in cases of outrageous conduct which to us is a higher degree of misconduct than the former.

■ We therefore hold that the tort of outrageous conduct is one in which punitive damages may be allowed and in this case the Trial Judge committed no error in submitting that issue to the jury.

Moving on to the alleged excessiveness of the verdict; the verdict as approved by the Trial Court for compensatory damages in both the contract and tort claims of Mrs. Johnson is in the amount of $100,000. The jury's award for compensatory damages does not distinguish between the tort and contract cases. The award is for compensatory damages in both with no separate amounts for either.

As we have before shown, Mrs. Johnson was entitled to compensatory damages in both, i. e., damages for the mental suffering resulting from the breach of the burial contract and damages for the mental suffering resulting from the outrageous conduct (display of the body). The defendant hospital could have been liable for the mental suffering caused by the breach of the burial contract even if there had been no display or outrageous conduct and conversely. So, in effect, we have two sufferings which are compensable. True, they somewhat overlap but without knowing what amount was awarded for what we are unable to say the total compensatory damages are excessive. There is proof in the record to the effect that Mrs. Johnson's mental damage is most probably permanent and will require psychiatric treatment for a considerable period of time. She is unable to see or meet children of tender years without becoming emotionally upset.

■ We therefore concur in the Trial Judge's action approving the award of compensatory damages to Mrs. Johnson in the amount of $100,000 and do not find the verdict so excessive as to shock the conscience of the Court. The Trial Judge and the jury below are best equipped to ascertain or place a value on the personal injury of mental suffering. See and com-

pare *Transports, Inc. v. Perry* (1967) 220 Tenn. 57, 414 S.W.2d 1; *Holt v. McCann* (1968 E.S.) 58 Tenn.App. 248, 429 S.W.2d 441.

Without prolonging more than necessary this already lengthy Opinion, we simply state that on the matter of the alleged excessiveness of the verdict for punitive damages of Mrs. Johnson and the verdict for Mr. Johnson for compensatory damages, it is our opinion that under the circumstances of the case the verdicts as adjusted by the Trial Judge are not so excessive as to shock the conscience of the Court nor do we believe the Trial Judge erred in granting the remittiturs that he did. See authorities cited in previous paragraph.

Our holding in the previous paragraphs not only overrules the hospital's Assignment of Error No. 1, but also will overrule the Assignment of Error of the plaintiffs which is directed to the action of the Trial Court in granting the remittiturs.

The hospital's 13th, 14th, and 15th Assignments of Error remain to be considered.

The 13th and 14th charge the Trial Court with error in failing to grant a mistrial because of the alleged misconduct of plaintiffs' counsel in repeatedly asking objectionable questions which objections were sustained by the Court and in stating to defense counsel in the presence of the jury: "You object to everything."

The record shows that plaintiffs' counsel was attempting to have certain testimony heard by the jury. He first asked the question in one manner, which was objected to and sustained. He then tried several rephrasings of the question in order to produce an unobjectionable question. Each rephrasing was objected to and sustained. It was simply a legitimate attempt to introduce evidence in a manner which counsel thought was admissible. The evidence sought to be introduced was later introduced by another witness. No harm was done and a mistrial should not have been granted.

During a hot cross-examination of the hospital's witness, the hospital interposed numerous valid objections. When another objection was made, counsel for plaintiffs in evident exasperation exclaimed, "You object to everything." The Trial Judge admonished the jury to disregard counsel's remark. If mistrials were granted on what appears to us to be such a triviality, a hotly contested trial could never be concluded. See *Crowe v. Provost* (1963 M.S.) 52 Tenn.App. 397, 374 S.W.2d 645.

The 13th and 14th Assignments of Error are overruled.

The 15th Assignment of Error is the Trial Court erred in failing to grant a new trial based on newly discovered evidence. This newly discovered evidence consists of the affidavits of Mrs. Minnie Perkinson and Mrs. Sandra Perkinson. These affidavits state both affiants knew the Johnsons prior to the occasion of this suit. Mrs. Minnie Perkinson was visiting her daughter-in-law who was confined in the Woman's Hospital in a room across the hall from the delivery room. On the day of Mrs. Johnson's delivery Mrs. Minnie Perkinson was in the hall talking to Mr. Johnson and overheard the conversation between Mr. Johnson and Mrs. Howell, the hospital nurse. The affidavit of Mrs. Minnie Perkinson is a contradiction of Mr. Johnson's testimony regarding his conversation with Mrs. Howell concerning the burial or disposal of the body. The affidavit of Mrs. Sandra Perkinson (daughter-in-law) contradicts the testimony of Mrs. Johnson regarding her knowledge of the manner of disposal by the hospital.

We quote from *Vest v. Bitner* (1950 E.S.) 34 Tenn.App. 575, 241 S.W.2d 438 at page 442:

"Under our decisions, a new trial will not be granted because of newly discovered evidence which is merely cumulative. *Noel v. McCrory*, 47 Tenn. 623; *Tabler v. Connor*, 60 Tenn. 195; *Mercer v. Ewing*, 6 Higgins Tenn.Civ.App. 384. Cumulative evidence is evidence which speaks to facts in relation to which there was evidence

on the trial. *McGavock v. Brown,* 23 Tenn. 251. Moreover, newly discovered evidence merely to contradict a witness is not sufficient to warrant a new trial. *Shelton v. Southern Ry. Co.,* D.C., 255 F. 182; *McAlister's Lessee v. Williams,* 1 Tenn. 119; *Gentry v. State,* 184 Tenn. 299, 198 S.W.2d 643, 648. In *Gentry v. State,* supra, our Supreme Court adopted the rule stated in 39 Am.Jur. as follows: 'It is well settled that a new trial will not be granted upon the ground of newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness's statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow.' "

The "newly discovered evidence" is cumulative and is for the purpose of discrediting the testimony of a witness. After having read the affidavits we cannot say that the contents thereof are so strong and convincing, that a different result must necessarily follow.

The granting of a new trial on the issue of newly discovered evidence is a matter within the sound discretion of the Trial Court. *Brown v. University Nursing Home, Inc.* (1972 Tenn.App.M.S.) 496 S.W.2d 503; *Zirkle v. Stegall* (1931) 163 Tenn. 323, 43 S.W.2d 192. We cannot say the Trial Judge abused his discretion and the final Assignment of Error is overruled.

The result is that the judgment is affirmed as to the defendant hospital only.

The judgment against Dr. Pallas is reversed and as to him the suit is dismissed.

Costs of appeal are adjudged against the defendant hospital and surety.

CARNEY, P. J., and MATHERNE, J., concur.