*Pinckney v. Jersey City,* 140 *N. J. Super.* 96 (Law Div. 1976).

The Legislature may choose to extend jurisdiction for third-party practice under the Tort Claims Act, but until it does so this court concludes that it is not within the scope of legislative intent to allow a plaintiff to file a direct action against a third-party even though defendant has already been joined. Plaintiff's motion to amend his complaint to file a direct action against the Borough of Bellmawr is denied.

MARIA MUNIZ AND JAIME MUNIZ, PLAINTIFFS, v. UNITED HOSPITAL MEDICAL CENTER—PRESBYTERIAN HOSPITAL, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided December 23, 1976.

*Mr. Adrian I. Karp* for plaintiffs.

*Messrs. Conway, Reiseman, Michals & Wahl* for defendant.

O'NEIL, J. C. C., Temporarily Assigned. Defendant moves for an order dismissing the complaint in this case for failure to state a claim on which relief can be granted (*R.* 4:6–2 & 3). The issue thus raised is whether the events constitute the so-called tort of "outrage," and if so, whether such a cause of action has been or should now be recognized in New Jersey. The complaint is drawn in two counts, in the first of which the following narrative is found.

Plaintiffs are husband and wife, and on April 21, 1975 Mrs. Muniz gave birth prematurely to a baby boy at St. Michael's Hospital in Newark. The infant manifested symptoms of respiratory distress and was immediately transferred from St. Michael's Hospital to the Presbyterian Hospital Unit of defendant corporation, where necessary facilities for treatment of the baby were available. The mother remained at St. Michael's. Unfortunately, the infant died at Presbyterian two days after birth.

On the day before the death the mother had telephoned defendant hospital and been advised that the infant was in good condition. Yet, on that same day when plaintiff-father sought to visit the infant he was not permitted to see the child and learned nothing of its condition. At about 9:30 in the evening of April 23, however, the mother received a telephone call at her hospital room in St. Michael's from "an unidentified agent, servant or employee of the defendant" who stated that the baby's heart had stopped

beating and the baby was dead. The mother became hysterical and required a sedative.

The complaint then describes plaintiffs' efforts to verify the death and to get the body for burial if the report were true, alleging that between April 24 and May 14, 1975 constant and repeated personal inquiries of defendant hospital failed to establish the veracity of the telephone report and left them uncertain whether the baby was dead or alive. In personal visits by the father and telephone inquiries by the mother they were told each time that the person spoken to did not know whether the baby was alive or dead or why its body had not been made available to the parents. On May 15, 1975 Mr. Shamus, a hospital employee, told the mother that he had ascertained the baby was dead but was not able to locate the body. Finally, on May 16, 1975 — more than three weeks after the baby's death — he advised that the baby's body had been located "upstairs" and asked them to claim it. Presumably, they did so.

The foregoing appear to be all the *facts* alleged in the complaint and are stated in the first five paragraphs of the first count. No issue is made of the care given to the baby, and damages are not sought because of the death. Instead, paragraph 6 characterizes the recited events as negligent deviation in a number of respects from standard methods of hospital administration. It complains that defendant failed to advise the parents of the baby's death "as expeditiously and humanely as possible," delivering instead a "callus [sic], offhand announcement by an unidentified telephoner to a hospitalized woman in the dead of the night coldly announcing the death of a newborn infant." This feature was asserted to violate "any and all bound of humanity" and to be a "gross deviation from any and all accepted mode of administration or conduct in connection with such a medical incident." Similar negligent deviation is asserted in the "failure to invoke any humane follow up procedure by either personal or even written contact with the plaintiffs to ad-

vise them as to the factual background leading to the baby's death" or to "formally" notify them of the child's death.

The final negligence alleged is the "gross and callus [sic] failure to maintain a system of locating corpses of patients who expire while hospitalized" so that the infant's body was *"presumable"* [sic] [emphasis supplied] lost or missing while under defendant's control for over three weeks. According to paragraph 7 of the first count the effect of all this was that both plaintiffs "were subjected to intense, prolonged and unrelenting emotional anguish, distress and anxiety which plagued them down to the filing of" the complaint.

It thus seems fair to observe that the first count asserts simple negligence, notwithstanding the generous use of modifiers such as "callous," "coldly" and "gross."

The second count consists of three paragraphs, the first of which repeats and incorporates the allegations of the first count. The second paragraph reads:

2. The plaintiffs jointly and severely [sic] assert that the above stated conduct of the defendant, United Hospitals Medical Center—Presbyterian Hospital taken at its most liberal and fair interpretation still constitutes outrageous conduct by means of the gross and wanton negligence of the defendant as constituting an intentional infliction of mental and physical suffering to both plaintiffs.

In paragraph 3 plaintiffs specifically plead "the tort of outrage * * * by reason of a conduct generally unacceptable to either business or professional intercourse within the community."

The second count, therefore, contains no different facts than those stated in the first count and the description of defendant's conduct as intentional is simply a gratuitous and argumentative characterization by the pleader of the same facts recited in the first count. Indeed, at oral argument on the motion plaintiffs' attorney acknowledged that the second count contained and relied on no additional factual allegations. This is significant in deciding what well pleaded *facts* are admitted by defendant for the pur-

poses of this motion. The only other difference between the two counts is that the *ad damnum* clause in the second count seeks punitive damages, whereas only simple damages are sought under the first count.

Furthermore, except for what may be indicated by the reference to "intense, prolonged and unrelenting emotional anguish, distress and anxiety," there is no allegation of physical illness or hurt, and apart from the sedative administered on April 23, no reference at all to any treatment, whether the effects of the events be regarded as physical, mental or emotional.

Defendant's argument in support of its motion is that New Jersey has not allowed a cause of action for mental anguish in the absence of physical impact upon plaintiff and physical trauma resulting from the anguish. Additionally, it asserts that defendant's alleged conduct is not "so extreme and outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community," which it views as the essence of such a tort.

Plaintiffs' response is two-fold. They assert, first, that physical suffering as contrasted with simple mental or emotional anguish is alleged in paragraph 2 of the second count. Additionally, they assert defendant's conduct to have been so gross, wanton and outrageous as to warrant punishment by assessment of damages.

The tort of "outrage" has apparently been dealt with in New Jersey under that express label only once, *Hafner v. Hafner*, 135 *N. J. Super.* 328 (Law Div. 1975). The principal conduct there complained of — deliberate interference by a stepson and his wife with a father's affection for plaintiff-stepmother — was found as a matter of law not to "amount to the type of outrage necessary to establish a cause of action" (135 *N. J. Super.* at 334). That particular aspect of the complaint really sounded in alienation of affections, and therefore recovery was barred in any event by the Heart Balm Act, *N. J. S. A.* 2A:23–1. However, in reviewing the

local cases which had allowed recovery for emotional distress, the court noted a useful distinction between those cases where such distress was simply an element of damages caused by an independently recognized substantive tort, and those where the infliction of emotional distress was itself alleged to be the tort.

This distinction is not only useful but necessary in evaluating as precedents the many cases in New Jersey and elsewhere which have been considered the compensability of mental distress.

Until about a decade ago New Jersey had traditionally denied recovery for emotional distress resulting from fright, holding that physical suffering was not a probable or natural consequence of fright in "a person of ordinary physical and mental vigor," and that one had the right to assume that persons likely to be affected by one's acts "are of average strength both of body and of mind." *Ward v. West Jersey and Seashore R. Co.*, 65 *N. J. L.* 383, 385 (Sup. Ct. 1900). However, a less spartan view of the average citizen's emotional vulnerability was adopted in *Falzone v. Busch*, 45 *N. J.* 559 (1965). Recovery is now allowed where negligence causes fright from a "reasonable fear of immediate personal injury" producing "substantial bodily injury or sickness," and such injury or sickness would have been compensable to plaintiff if it had resulted from physical impact rather than fear 45 *N. J.* at 569.

There are similar recent decisions in vehicular cases in other states, and plaintiffs in the present case cite them in support of their cause: *Dillon v. Legg*, 68 *Cal.* 2d 728, 69 *Cal. Rptr.* 72, 441 *P.* 2d 912 (Sup. Ct. 1968); *D'Amicol v. Alvarez Shipping Co., Inc.*, 31 *Conn. Sup.* 164, 326 *A.* 2d 129 (Super. Ct. 1973); *Leong v. Takasaki*, 55 *Hawaii.* 398, 520 *P.* 2d 758 (Sup. Ct. 1974); *D'Ambra v. U. S.*, 338 *A.* 2d 524 (R. I. Sup. Ct. 1975). However, although these cases did deal generally with the compensability of emotional disturbances, their fact patterns presented the kind of ordinary negligence which has always been actionable by plaintiffs

who had sustained provable damages. None of them made a new kind of conduct tortious. They simply expanded the scope of damages in universally recognized torts. However, the significant judicial exercise in an "outrage" case is not so much the inquiry into plaintiffs' damages as it is the qualitative appraisal of defendant's conduct, its motivation and deliberateness.

In a word, the tort of "outrage" is more than negligence.

The *Restatement, Torts,* 2d, § 46(1) at 71 (1965), under the caption of "Outrageous Conduct Causing Severe Emotional Distress," puts it this way:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Dean Prosser explains the tort as follows:

In the great majority of the cases allowing recovery the mental distress has been inflicted intentionally, either in the sense that the defendant desired to cause it, or that he knew that it was substantially certain to follow from his conduct. There are, however, a few cases which indicate that liability for extreme outrage is broader than intent, and that it extends to situations in which there is no certainty, but merely a high degree of probability that the mental distress will follow, and the defendant goes ahead in *conscious* disregard of it. This is the type of conduct which commonly is given the name of wilful or wanton, or sometimes recklessness. [*Prosser, Law of Torts,* (4 ed. 1971) § 12 at 60; emphasis supplied]

Yet, justification for caution in appraising cases where only emotional effects are alleged is found in then—Professor Calvert Magruder's perceptive review of the cases extant four decades ago:

Conceivably a principle might have been developed that mental distress purposely caused is actionable unless justified, thus casting upon the defendant the burden of establishing some privilege by way of rebutting the *prima facie* liability. That this was not done is hardly to be ascribed to any inherent difficulty in assessing damages, as has already been indicated. Rather, it was due to policy considerations of a different sort. Adoption of the suggested prin-

ciple would open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law. Quite apart from the question how far peace of mind is a good thing in itself, it would be quixotic indeed for the law to attempt a general securing of it. Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be. Furthermore, in an *ad hoc* manner, and perhaps not very scientifically, the courts have in large measure afforded legal redress for mental or emotional distress in the more outrageous cases, without formulating too broad a general principle. [Magruder, "Mental and Emotional Disturbance in the Law of Torts," 69 *Harv. L. Rev.* 1033, 1035 (1936)]

The classic illustration of this tort cited by Professor Magruder (op. cit. at 1045) is *Wilkinson v. Downton,* 2 *Q. B.* 57 (1897) where defendant had to respond in damages for a lady's illness caused by his completely fabricated story of serious injuries to her husband. Indeed, this is the first illustration of the tort offered in the commentary to § 46 of the *Restatement.* In a variation on this theme, a jury question was held to exist concerning the ruse of a sheriff who held a valid warrant for the plaintiff's commitment, but sought to entice her to a hospital with a tale that her husband and baby were there badly injured. *Savage v. Boies,* 77 *Ariz.* 355, 272 *P.* 2d 349 (Sup. Ct. 1954). Other "outrages" were: a fulfilled threat to kill plaintiff's husband, *Knierim v. Izzo,* 22 *Ill.* 2d 73, 174 *N. E.* 2d 157 (Sup. Ct. 1961) ; a physician's cold and heartless refusal to treat plaintiff's baby in an emergency, *Rockhill v. Pollard,* 259 *Or.* 54, 485 *P.* 2d 28 (Sup. Ct. 1970) ; persistent, uninvited and unwanted solicitations to the female plaintiff to engage in illicit sex relations. *Samms v. Eccles,* 11 *Utah* 2d 289, 358 *P.* 2d 344 (Sup. Ct. 1961), and a suicide by throat-cutting in plaintiff's kitchen (at least if intended to produce the shock and upset which occurred), *Blakeley v. Shortal's Estate,* 236 *Iowa* 787, 20 *N. W.* 2d 28 (Sup. Ct. 1945).

Perhaps the kind of "everyday" conduct most easily tabbed as "outrage" was the brazenness of overbearing insurance ad-

justers who subjected ill and feeble plaintiffs in their sick beds to persistent, rude and accusatory questioning, resulting in aggravation of their illnesses. *Interstate Life & Acc. Co. v. Brewer,* 56 *Ga. App.* 599, 193 *S. E.* 458 (Ct. App. 1937); *Continental Cas Co. v. Garrett,* 173 *Miss.* 676, 161 *So.* 753 (Sup. Ct. 1935); *Pacific Mut. Life Ins. Co. of Cal. v. Tetirick,* 185 *Okl.* 37, 89 *P.* 2d 774 (Sup. Ct. 1939), and *National Life & Acc. Ins. Co. v. Anderson,* 187 *Okl.* 180, 102 *P.* 2d 141 (Sup. Ct. 1940). In each case it was held that if the adjuster knew or should have known the likely consequences of his conduct, a tort liability could be established.

In *Price v. Yellow Pine Paper Mill Co.,* 240 *S. W.* 588 (Tex. Civ. App. 1922), an employer was held liable for a wife's miscarriage emotionally triggered when the husband was brought home bloody and bruised after an on-the-job accident. He had asked his foreman not to take him home, accurately foretelling his pregnant wife's emotional reaction. Although certainly no injury was intended, the foreman was on notice of the possible consequences and nevertheless persisted.

Except for one of the corpse cases collected *infra,* the closest New Jersey seems to have come to decisions like the foregoing is in *Harris v. D. L. & W. R. Co.,* 77 *N. J. L.* 278 (Sup. Ct. 1909), where damages were affirmed for the embarrassment, indignity and ignominy of a passenger when a surly and insolent conductor wrongly confiscated his commutation ticket.

One feels the same outcome ought to have resulted in *Oehler v. L. Bamberger & Co.,* 4 *N. J. Misc.* 1003, 135 *A.* 71 (Sup. Ct. 1926). A salesman left a vacuum cleaner with plaintiff, who had refused to purchase it. He returned months later and demanded payment. Upon refusal he threatened plaintiff with arrest and otherwise conducted himself in an overbearing and intimidating manner. According to the complaint, she was so severely frightened that she was stricken with apoplexy. In affirming a nonsuit the court

recognized the reprehensible nature of the conduct, but found the effects alleged were not the natural and probable consequences to a normally stable person.

The absence of this essential element of predictability also produced the result in *Justesen v. Pa. R. Co.*, 92 *N. J. L.* 257 (Sup. Ct. 1918). Plaintiff there was a passenger stranded overnight in Union Station, Washington, because of an infantile paralysis epidemic, which she had been advised in advance would not interfere with her journey. She alleged severe and extended distress and mortification and illness which kept her in bed for two weeks. A verdict for plaintiff was reversed because, again, her complaints were found not to be either the necessary or natural effect of the misinformation.

In all of the cases in this line the tort was more than ordinary negligence. Each of them in some way met the *Restatement* prescription of intentional or reckless conduct and, where reckless, they also present the element Prosser suggests as constituting that quality, *i. e.*, the conscious disregard of highly probable consequences. Thus it is deliberateness — real or constructive — which separates the "outrage" cases as a special class of emotionally consequential torts.

Does the complaint here demonstrate such intentional or consciously reckless conduct by defendant hospital? It does if the second count can be taken at its literal face value, and the adjective "intentional" regarded as a well-pleaded fact. However, it is entirely clear that the second count does not recite any new facts. Rather it is a theoretical reconstruction of exactly the same facts set out in the first count, and a motion to dismiss does not accept an adversary's theories; only the truth of the facts which he recites. *Clark v. Associated Retail Credit Men*, 70 *App. D. C.* 183, 105 *F.* 2d 62, 69 (D. C. Ct. of App. 1939), dissenting opinion of Judge (later Chief Justice) Vinson. Accordingly, defendant by the present motion does not admit the argumentative assertion in the second count of intentional conduct, and no suggestion of deliberateness is found in the events narrated

in the first count. The question whether the facts of the first count support the theory suggested in the second must therefore be decided as question of law.

Once the baby has died, no one could dispute that the perents had a right to know of the death, and the hospital a duty to inform them. The news, perhaps, could have been broken more gently, but one doubts that the resulting grief would have been any less. Judge (now Chief Judge) Breitel's concluding comments in *Tobin v. Grossman,* 24 *N. Y.* 2d 609, 301 *N. Y. S.* 2d 554, 249 *N. E.* 2d 419 (Ct. App. 1969), are apposite:

Beyond practical difficulties there is a limit to attaining essential justice in this area. While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realties of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. The risks of indirect harm from the loss or injury of loved ones is pervasive and inevitably realized at one time or another. Only a very small part of that risk is brought about by the culpable acts of others. This is the risk of living and bearing children. It is enough that the law establishes liability in favor of those directly or intentionally harmed. [301 *N. Y. S.* 2d at 561, 249 *N. E.* 2d at 424]

The most that can be said of the brief, true, but unwelcome telephone announcement is that it was careless to have conveyed the message without any prior warning. Even such a theory, however, simply demonstrates negligence, and the *Restatement* views such negligence as actionable only if the actor should have recognized that his or her conduct involved "an unreasonable risk of bodily harm." *Restatement, Torts* 2d, § 436 at 456. No such risk appears in this case, and even if it did, the bodily harm did not occur, and § 436A of the *Restatement* would again suggest no liability for negligence:

If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm

or other compensable damage, the actor is not liable for such emotional disturbance.

There seems no reason to quarrel with the *Restatement* formulas defining this type of tort. They are supported by the fact situations of the cases mentioned above. They make sense. Hence, the telephone call announcing the baby's death does not constitute a cause of action. It is not actionable as "outrage" for lack of deliberateness. It is not actionable as negligence because no physical hurt or other compensable damage resulted.

What is to be said, then, about the other object of plaintiffs' complaint, *viz.*, the astonishing delay in locating the baby's body?

It does not appear that the parent's inquiries were handled rudely or indifferently; simply, that the people to whom inquiries were made could not locate and identify the baby's body. Possibly the rather unusual presence in the hospital of a newborn baby taken there in an emergency without its mother eluded normal identification procedures. Possibly this was an anomalous situation which an ordinarily well-managed hospital could not be expected to have foreseen in establishing its routine procedures. If so, the loss of the body would not constitute negligence. However, even if it did, the *Restatement*, § 436A, *supra* at 461, would again indicate that plaintiff should not recover. Notwithstanding these technical dictates of logic, one has an almost unavoidable reaction that a hospital's misplacement of a body of an expired patient — even such a recently born infant — for some three weeks is inexcusable. The real question, therefore, becomes, in this phase of the case, does "inexcusable" equate with "actionable"?

Admittedly, many of the cases where recovery was allowed for the effects of emotional disturbances concerned misplaced, mishandled or mutilated dead bodies. New Jersey has allowed such a recovery, not as negligence or "outrage," but for infringement of plaintiff's property right in a dead body

and its burial. *Spiegel v. Evergreen Cemetery Co.,* 117 *N. J. L.* 90 (Sup. Ct. 1936). At the same time, evolving a property right "out of thin air" to justify such a recovery has been said by Dean Prosser to be "a fiction likely to deceive no one but a lawyer" when "in reality the personal feelings of the survivor are being protected" (Prosser, *op. cit.,* § 12 at 59). Chief Judge Breitel agrees that is the protective intent. *Johnson v. State,* 37 *N. Y.* 2d 378, 372 *N. Y. S.* 2d 638, 642, 334 *N. E.* 2d 590, 593 (Ct. App. 1975). However, despite the generality of this last comment, an examination of the actual cases in which such recoveries have been had indicates that in all of them there were allegations or proof of positive conduct toward the body, usually in the presence of the plaintiffs, which was clearly offensive. It is hard to find a case awarding damages because of a simple failure of a defendant to act. Most recoveries were against undertakers or common carriers, where there is always present an element of breach of a commercial contract. Recoveries against hospitals are rare, and research has not found one based upon a simple inability to locate the body.

In *Spiegel v. Evergreen Cemetery Co., supra,* the cemetery had dug the grave in a wrong lot; agreed to dig it in the right lot and re-inter later in the day in plaintiffs' presence, but then did so before plaintiffs' arrival, and back-filled the grave. Months later it agreed to reopen the grave, allow identification and re-inter. The relatives had to gather on two more occasions before burial was finally and correctly accomplished.

In *Renihan v. Wright,* 125 *Ind.* 536, 25 *N. E.* 822 (Sup. Ct. 1890), damages for mental anguish resulted from an undertaker's breach of a contract to take and keep the body of a dead child until the parents were ready to bury it. Burial was prematurely made without plaintiffs' knowledge or presence. In *Blanchard v.. Brawley,* 75 *So.* 2d 891 (La. App. 1954), an acetylene torch was used in the presence of obvious gasoline fumes to extricate a coffin after collision with a truck. A conflagration ensued which horribly mutilated

the body. In *Lindh v. Great Northwestern R. Co.*, 99 *Minn.* 408, 109 *N. W.* 823 (Sup. Ct. 1906), a carrier negligently left a casket out-of-doors exposed to the elements, resulting in mutilation and disfigurement of the corpse. In *Boyle v. Chandler*, 33 *Del.* 323, 138 *A.* 273 (Sup. Ct. 1927), an undertaker was liable for transferring a body from the casket selected by plaintiff to another because the chosen casket would not fit into the shipping case available. The body was affected somewhat and the deceased's clothing disarranged. Recovery was allowed for mental suffering resulting from grossly negligent or wantonly malicious conduct. Undertakers were also held responsible for mental anguish caused by poor performance of their contracts in *Brown Funeral Homes v. Baughn*, 226 *Ala.* 661, 148 *So.* 154 (Sup. Ct. 1933) (negligent embalming); *Lamm v. Shingleton*, 231 *N. C.* 10, 55 *S. E.* 2d 810 (Sup. Ct. 1949) (water and mud seeped in, forcing casket above the ground), and *Carey v. Lima, Salmon & Tully Mortuary*, 168 *Cal. App.* 2d 42, 335 *P.* 2d 181 (D. Ct. App. 1959) (poor embalming resulting in body arriving at distant destination in decaying condition).

Except in New York it is difficult to find cases in which recoveries for mishandling of bodies were allowed against hospitals.

A recent Tennessee case allowed recovery on a theory of either breach of contract or the tort of outrage against a hospital in a repulsive situation. *Johnson v. Woman's Hospital*, 527 *S. W.* 2d 133 (Ct. App. 1975). A premature child died at the hospital shortly after birth, and the mother believed the hospital had attended to burial. A pathologist's report later seen by chance at her doctor's raised doubts, and the doctor's nurse accompanied her to the hospital. There she was handed a jar of formaldehyde in which was floating the discolored and shrivelled body of her premature fetus.

In New York the principal recoveries have been against the state in the Court of Claims for incidents in state hospitals. In *Lott v. State*, 32 *Misc.* 2d 296, 225 *N. Y. S.* 2d

434 (Ct. Cl. 1962), two patients, one Catholic and one Jewish, died in the Brooklyn State Hospital at about the same hour; their bodies were delivered to designated undertakers, but their identifying tags were negligently interchanged. Thus, the body bearing the Catholic's name was embalmed and cosmeticized and rosary beads were twined in its hands, violating the religious restrictions of the Jewish family. It was noted that "damages will be awarded against any person who * * * improperly deal with the decedent's body." 225 *N. Y. S.* 2d at 436.

In *Weingast v. State,* 44 *Misc.* 2d 824, 254 *N. Y. S.* 2d 952 (Ct. Cl. 1964), a Catholic and a Jewish patient had themselves prankishly switched identities several years before one of them died at the Pilgrim State Hospital. In the belief that the Catholic had died, burial was had in the hospital cemetery according to Catholic rites. Later the relatives of the Jewish patient recognized that the survivor was not their relative. The negligence alleged was the failure to exercise proper supervision over the live patients, and the improper handling of the body was found to be a logical result of the original negligence. Two complaining relatives were awarded only $600 each, since neither had visited the patient for four years.

In *Johnson v. State, supra,* Hudson River State Hospital had two patients by the same name, and the wrong next of kin were notified when one died. The error was discovered by the kin of the living patient on the first afternoon of the wake for their supposedly deceased relative. The body was immediately returned, the daughter of the living patient became hysterical, was absent from work for 11 days, and for months afterwards had nightmares and terrifying dreams due to what was testified to as an anxiety neurosis. The court was satisfied that there were adequate objective manifestations of this neurosis. The Court of Claims had awarded the daughter damages for both the funeral expenses and emotional harm, but denied punitive damages. The Appellate Division had limited the

award to the amount of erroneous expenditure for the funeral, and otherwise affirmed. The Court of Appeals reversed, allowing recovery "for emotional harm sustained by her as a result of negligent misinformation given by the hospital that her mother had died." 372 *N. Y. S.* 2d at 639, 334 *N. E.* 2d at 591.

However, it is significant that Chief Judge Breitel, writing for a majority of the Court of Appeals, gave special attention to the question of whether physical consequences of emotional trauma are essential to the recovery:

One to whom a duty of care is owed, it has been held, may recover for harm sustained solely as a result of an initial negligently-caused psychological trauma, but with ensuing psychic manifestation, with residual physical manifestation. [Citation omitted] In the absence of contemporaneous or consequential physical injury, the courts have been reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone. [372 *N. Y. S.* 2d at 641, 334 *N. E.* 2d at 591–592]

The opinion then notes that the reason for such a restriction suggested by Prosser (*op. cit.* 1 § 54 at 328) is a guarantee of trustworthiness in the "ordinary case". Prosser, however, as the court observes, points to "two groups of special cases" where mental disturbance alone has produced a recovery. One of these groups "has involved the negligent mishandling of corpses." *Id.* at 329. These cases, Prosser believes, present "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Id.* at 330. Since the other class mentioned is the negligent transmission of a telegram announcing death, which in a minority of states justifies recovery, it is clear that a natural sensitivity to the grief of mourners is the only special circumstance which is a significant contributor to the relaxation of the physical consequence requirement suggested for the "dead body cases."

For Prosser concludes his commentary on this phase, suggesting that there may be other areas with similar potential for trustworthiness, adding:

Where the guarantee can be found, and the mental distress is undoubtedly real and *serious*, there is no essential reason to deny recovery. But cases will obviously be rare in which mental anguish, not so severe, as to cause physical harm, will be *so clearly a serious wrong worthy of redress*, or sufficiently attested by the circumstances of the case. [Id. at 330; emphasis supplied.]

Interestingly, the Court of Appeals' ruminations on these passages in *Johnson v. State, supra,* having started with an awareness of the normal requirement of physical symptoms to support a recovery in negligence for emotional disturbance, found its plaintiff's emotional harm compensable, "especially if supported by *objective manifestations* of that harm." 372 *N. Y. S.* 2d at 642, 334 *N. E.* 2d at 593; emphasis supplied.

Hence both the court and the text writer give something less than unqualified support to the principle that emotional disturbance alone gives rise to liability for negligence involving a corpse.

In the cases previously cited, where recovery was allowed for mishandling dead bodies, there were certain objective circumstances found which are not alleged in the present case. In most of them defendant was an undertaker or a common carrier who was guilty of breach of a contract which required certain specific conduct with respect to the dead body. Where recovery was against a hospital, the handling was either shockingly gross, as in *Johnson v. Women's Hospital, supra,* the body was delivered to others than the next of kin, religious ritual was frustrated, or plaintiff was caused an expenditure of money. Damages were awarded to compensate for some or all of those elements, none of which appears in the instant case.

Since the allegations here do not fit any of the fact patterns which have supported relief in the cited cases, it would broaden this area of tort law to sustain this com-

plaint, and this defendant does not appear to be the appropriate guinea pig for such experimentation.

Defendant is a private voluntary hospital, nonprofit and charitable in nature, the kind of institution which traditionally was immune to suit for its own negligence at the instance of those who are beneficiaries of its services. Of course, that immunity was judicially terminated, *Collopy v. Newark Eye & Ear Infirmary*, 27 *N. J.* 29 (1958), but the Legislature quite promptly restored it in limited fashion (*L.* 1959, *c.* 90; *N. J. S. A.* 2A:53A–7 through 11.) According to § 4 of the 1959 enactment (*N. J. S. A.* 2A:53A–10) the act is "remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein *in furtherance of the public policy for the protection of nonprofit corporations,* societies and associations organized for religious, charitable, educational or hospital purposes." (Emphasis supplied). The prompt legislative response indicates an intent to reassert the principle of immunity but at the same time to meet the more significant objections to immunity voiced by the Supreme Court in *Collopy.* The most compelling of these seemed to be a humane consideration that "individuals 'should not be forced to suffer the unmitigated and oftentimes crushing burden of injuries wrongfully inflicted * * *'" (27 *N. J.* at 40). Thus, the second section of the judicial response requires a hospital such as defendant to respond in damages to a beneficiary "who shall suffer damage from the negligence of such corporation * * * to an amount not exceeding $10,000 * * *" (*N. J. S. A.* 2A:53A–8).

However, it would appear inconsistent with the declared policy to protect such hospitals to interpret "damages" and "negligence" more broadly with respect to such a defendant than is done in the case of a negligent driver. For the latter does not have to respond to the emotionally upset plaintiff unless the fright his negligence caused also produced "significant bodily injury or sickness" *Falzone v.*

*Busch, supra.* And generally negligence is not actionable without its production of physical consequences to emotional disturbance. *Restatement, Torts* 2d, § 416A.

Hence, however appropriate it may be with other types of defendants to relax the requirement of physical hurt where a dead body is involved, it would ill serve the protective public policy to do so here. Plaintiffs have not had any financial burden — much less a "crushing" one — for which compensation is appropriate.

It seems safe to infer from the declared protective policy of the legislative response to *Collopy,* as well as from the reasons given in *Collopy* for terminating charitable immunity, that the Legislature not only intended to limit a hospital's financial exposure from liability for its negligent acts, but that it also did not intend the liability to be for a broader kind of negligent conduct than the negligence exposure of other defendants for whom there is no such protective public policy. Such considerations give additional support to a finding of no liability in the present case, but they are not a primary underlying reason for such a holding.

To summarize, therefore: the facts presented by this complaint are not the kind which constitute a cause of action. The first count of the complaint sounds in simple negligence, a tort for which this State has not afforded relief except when significant physical consequences flowed either directly from the negligence or from emotional symptoms which the negligence was likely to produce. Although Dean Prosser suggests that where a dead body is involved serious emotional disturbance due to negligence may be compensated for without proof of physical symptoms, in the present case there was not the kind of positive mishandling of a body which has been present in all those cases which might be exemplars of the exception Prosser refers to. In other words, the normal strictures of *Restatement, Torts* 2d, § 416A, should be observed in the present case as a matter of law. Furthermore, the "seriousness" of the emotional trauma which Prosser sees as sufficient to dispense with physical

symptoms in such cases, seems lacking here. No treatment at all was sought, and it seems more reasonable that the continued grief which is alleged is the normal sorrow at the loss of the child, rather than a reaction to any omission on defendant's part. Indeed, it is probable that awareness of the deficiencies of the first count would be the reason counsel set up the second count. However, as already indicated, the second count is simply an argumentative recasting of the same events pleaded in the first count, adding the gratuitous allegation that the conduct was "intentional" as a matter of law, rather than a matter of fact. There is no allegation in any factual sense of intentional acts by defendant aimed at these plaintiffs, nor of actions wantonly persisted in with plausible expectations of unusual and harmful results. Such intention or deliberateness is a requisite for the so-called tort of "outrage." It calls for conduct which would cause reasonable people to be in fact sufficiently outraged at and angry with this defendant to assess the punitive damages which the second count seeks. Without any lack of sympathy for the parents' predicament in this case, one finds it difficult to form that perception of the defendant's conduct.

Accordingly, it is found that neither count states a cause of action on which relief can be granted, and the motion to dismiss is granted.