# CHATTANOOGA GAS COMPANY v. THOMAS R. UNDERWOOD, JR.—270 S. W. (2d) 652.

Eastern Section. January 6, 1954.

Petition for Certiorari denied by Supreme Court, May 21, 1954.

144

Harry J. Schaeffer and Hunt & Ingle, all of Chattanooga, for plaintiff in error.

Graham & Brock, of Chattanooga, for defendant in error.

HOWARD, J., This action for damages for personal injuries grew out of a gas explosion in which the plaintiff, Thomas R. Underwood, Jr., was severely burned and permanently injured.

The accident occurred on February 5, 1951, while the plaintiff, a Captain in the Fire Department of the City of Chattanooga, was working with the Fire Prevention Bureau, a subsidiary of said Department. At the time plaintiff had answered a call to investigate a fire and explosion reported at 21 West Bell Avenue in North Chattanooga, and while he was inside the building a second explosion occurred, severely burning him on the hands, face, ears and neck. The building, located on the north side of Bell Avenue, was formerly used as a store but previous to the accident had been converted into two apartments. It was approximately 29 feet wide by 23 feet long, had two entrances, Nos. 21 and 22, with a bathroom built onto the back. This bathroom, approximately 6 x 8 feet, was used jointly by the two families occupying the building. Doors from each apartment opened into a hallway leading to the bathroom.

On the date of the accident there had been a fire of unknown origin about 5:30 P.M. under the floor of the bathroom, which was extinguished at 5:45 by firemen of the Chattanooga Fire Department, and at 6:45 while Charlies Jones, one of the occupants of the building, was in the bathroom lighting a cigarette with a lighter, the first explosion occurred. This explosion blew out all the windows in the building and Jones was so severely burned on his hands and face that he had to be sent to

the hospital. Immediately following this explosion the defendant was notified that escaping gas might have caused the trouble, and two of its servicemen were hurriedly dispatched to make an investigation of the premises. They arrived about 7:05, found no gas pipes in the building nor evidence of any natural gas, though it appears to have been present.

Plaintiff, whose duties required him to investigate the origin of fires and explosions, lived only a few blocks away and arrived on the scene a few minutes after the defendant's servicemen. After being informed as to what had happened, plaintiff, accompanied by Elmer Perry, one of the occupants of the building, entered and started his investigation. They had been in the bathroom for just a few minutes when the second explosion occurred, injuring both of them. Only one of the defendant's servicemen was in the building at the time, and because he was standing in the front of the building he escaped injury. Though there were no fires following either of the explosions, the Fire Department returned to the scene immediately following the first explosion and was standing by when the second explosion occurred.

Following the second explosion an investigation disclosed that a connection at the bottom of the commode was defective; that through said defective connection sewer and other gases escaped, and that no vent had been provided for this purpose. By the force of the explosion the commode was blown loose from the floor, the pipe which connected it with the sewer was left open and exposed, and the walls and floor of the bathroom were badly burned.

On the following morning about 10 o'clock the defendant's employees discovered that natural gas was escaping

from its three inch main about 50 feet from the building. This main ran parallel with the street and was only a few feet from one of the City's sewer lines. After excavating, two holes were discovered in the gas main, the holes being described as about the size of a pea and the blade of an ordinary knife. The escaping gas had followed along the main to the sewer pipe where it had entered through a hole in the top, and thence up the sewer pipe to the bathroom where the explosions occurred.

Plaintiff's declaration alleges that the defendant was guilty of the following specific acts of negligence:

(1) That the gas in the building which caused the explosions had escaped from one of the defendant's gas mains located nearby, which the defendant negligently permitted to become defective; that said main was under defendant's exclusive control.

(2) That the defective condition of the gas main had existed for a long period of time and was known to or should have been known to the defendant had the proper degree of care been exercised.

(3) That after notice of the first two explosions the gas company failed to correct the leaks, cut off the gas, or take other precautionary methods to prevent leaks.

(4) That the gas company was negligent in dispensing gas in such a manner that it could not stop or prevent the escape of gas with reasonable dispatch.

(5) That the gas company was negligent in failing to warn the plaintiff of the presence of gas and of the nature and extent of the danger, especially since an agent of the company was present on the premises when the plaintiff arrived, knew of plaintiff's arrival and talked to him, knew or should have known of the presence of gas and the nature and extent of the danger, and knew or should

have known that the plaintiff was unaware of the nature and extent of the danger confronting him.

(6) That the gas company was negligent in not sufficiently odorizing its gas so that it could be detected upon reasonable contact, and so that the plaintiff would be warned by its odor of its presence and resulting dangers.

(7) That the defendant company was negligent in failing to make reasonable and proper inspections of its said gas mains to detect the escape of gas therefrom.

Defendant interposed a plea of not guilty and filed numerous special pleas in which it was averred that there were no gas lines into the building where the explosion occurred; that after the first explosion, which was preceded by a fire, defendant's servicemen were sent to the scene to ascertain, if possible, the cause of the explosion; that upon finding no gas lines in the building these men made an inspection of the gas main nearby where they discovered escaping gas caused by electrolysis, over which the defendant had no control or knowledge of until after the second explosion.

Defendant further averred that the plumbing in the building was defective because there was no vent for the escape of sewer or other gas fumes, and that in addition thereto there was a hole in the top of the City's sewer main which entered the premises and through which the escaping gas entered and was carried to the building; that "* * * when gas escaped from its main it followed along the main and into the sewer line to the premises" where it "collected and mingled with the sewer gas therein," which condition was also unknown to the defendant.

Defendant further averred that when the plaintiff entered the bathroom he picked up the open cigarette

lighter previously dropped by Charlie Jones and while closing it a spark was created which set off the second explosion; that the plaintiff being an official of the fire department and on the premises in the line of duty, assumed the risk and was guilty of contributory negligence.

Defendant also denied that the gas main was under its exclusive control, denied that it was responsible for the sewer line into which the escaped gas entered the premises, and averred that its gas was sufficiently odorized and that it had been diligent in investigating its mains, particularly the one involved, by the use of all scientific methods known to the gas industry.

The trial resulted in a jury verdict for the plaintiff for $7,500, which was approved by the trial judge, and judgment was accordingly entered. Thereafter, defendant's motion for a new trial was seasonably filed and overruled, and this appeal resulted. No question is made here regarding the amount of the verdict.

By proper assignments the defendant contends: (1) There was no evidence to support the verdict of the jury, and (2) the trial court erred in overruling its motion for a directed verdict made at the conclusion of all the evidence. While these assignments require a review of the evidence, such review is only to determine whether there is any substantial evidence to support the verdict. In such review we are required to take the strongest legitimate view of all the evidence favorable to the plaintiff, disregard all evidence to the contrary, and indulge all reasonable inferences to uphold the verdict. Jarratt v. Clinton, 34 Tenn. App. 670, 241 S. W. (2d) 941.

The rule is well settled that where there is any dispute as to any material determinative evidence, or any

doubt as to the conclusion to be drawn from all the evidence, the motion for a directed verdict must be overruled. Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806. And only where one conclusion can be reasonably reached from the evidence and inferences is it proper for a trial court to direct a verdict. Coca Cola Bottling Works v. Selvidge, 4 Tenn App. 558; Supreme Liberty Life Ins. Co. v. Pemelton, 24 Tenn. App. 576, 148 S. W. (2d) 1. Moreover, where there are conflicts in the evidence, this Court cannot assume the duty of determining liability or nonliability in tort actions but must leave such duty with the jury as the triers of facts. Jackson v. B. Lowenstein & Bros., 175 Tenn. 535, 136 S. W. (2d) 495.

With the foregoing rules in mind, we have carefully read the record and it is our conclusion that the case was properly submitted to the jury, and that there was ample evidence to support the verdict.

Plaintiff introduced as witnesses several members of the Chattanooga Fire Department, Officer Steele of the Police Department, and one occupant of the building, all of them testifying that they were familiar with the odor of natural gas, and that following the fire they entered the building and detected no odor of any gases, either natural or sewer, therein. However, about 10:30 P.M. it was discovered that natural gas was escaping through the exposed pipe which connected the commode with the sewer line. This discovery was made by Chief Mike Quinn, head of the Fire Prevention Bureau, while he was investigating the cause of the explosions.

While the defendant introduced proof as to the method of odorizing its gas, it neither produced those in charge of the odorization nor any evidence showing that

it was adequately odorized at the time of the explosions, and the jury could reasonably conclude that the defendant had been negligent in this respect.

Plaintiff testified that when he arrived on the scene he first talked to the defendant's serviceman who stated that he had already made an investigation of the premises and had found no natural gas present, that sewer gas had caused the previous explosion, and that anyone could safely enter the building; that on these assurances plaintiff, accompanied by Perry, entered the building and went immediately to the bathroom where they had been for only a few minutes when the explosion occurred. Describing his arrival and what subsequently occurred, the plaintiff testified, as follows:

"D. 37  When you went in the premises, now, did you see this man with the Chattanooga Gas uniform on on the inside?  A.  Yes sir.  He was standing back between the kitchen where the cook stove was sitting and this little offset in between the two rooms where both families use the same toilet facilities.

"D. 38  Did you talk to him?  A.  Yes sir.  I'd already talked to Officer Steele when I went in.  I said, 'Got a little trouble over here, haven't you, Bud?'  Just like that.  Just as a way of greeting him.  He said, 'Yes.  Tell me it's sewer gas.'  So I went on back, talked, I run into the gas man.  He was already in there.  I said to him, I said, 'What do you have here?'  Do you have gas in here?'  And he said no, and I said, 'Well are you sure?'  And he said, 'Definitely.'  He said, 'It's sewer gas, and you don't have a thing to worry about.'  Said, 'Have you tested the gauge?'  And he said, 'Absolutely.'  And he said, 'There's no natural gas here at all.  It was

sewer gas, and you don't have a thing to worry about.' He repeated that twice.

&ast; &ast; &ast; &ast; &ast; &ast;

"D. 47 &ast; &ast; &ast; Then Captain Tom, did you look to see whether or not there were any natural gas fixtures like heaters or ranges? A. Yes sir. And at the same time I was looking, I saw this cook stove, this coal cook stove there, and same, I was looking, I turned, asked the gas man, I said, 'Do you know whether they have any little space heaters sitting around for gas?' And he said, 'There's no gas in here at all.'' Said, 'I told you you don't have anything to worry about.' Said, 'No natural gas in here.'

"D. 48 Did you look around yourself? A. Yes sir.

&ast; &ast; &ast; &ast; &ast; &ast;

"D. 51 Now this heater, say there was a fire in the heater? A. Yes sir, in, it was a cook stove.

"D. 52 What kind of fire was it? A. Coal. Just ordinary coal fire.

&ast; &ast; &ast; &ast; &ast; &ast;

"D. 56 Could you see the coal fire? A. Oh yes, Saw the fire there and I said, 'Help put the fire out,' and they said wasn't necessary. No natural gas there. Nothing but sewer gas. Put so strong to me there's sewer gas there. In my teaching I'd already always received that sewer gas, once it expels itself, there's no more there, and he'd already stated to me he'd already used the instrument and wasn't any natural gas in the building.

"D. 57 Now if there had been natural gas, what would have been your instructions, and what would

have you done? A. Well, if he'd told me that there was natural gas in this building, I would immediately clear the building and allowed no one in there and waited till the proper authorities got over there and found the trouble.

"D. 58 Then what did you do after you talked to the Chattanooga Gas Company man? A. Well, I was, had my notebook in my hand and my pencil and I was making notes from what everyone was telling me about their explosions and—see, the first one was a fire, the first time went over there, and second time it was an explosion. And the second explosion is the one that brought out the front of the building and done most of the damage to the building, second explosion. And Perry understood that Mr. Jones was in this living room when the explosion occurred. Well, I was walking around there with him. So when we came to this little offset where you go into both apartments into this little bathroom, why, there is a cigarette lighter lying there with the lid open. So I asked Perry, I said, 'Do you suppose that's Mr. Jones' lighter?' and he says, 'Well,' he said, 'Looks like it.' Said 'I'm not positive.'

"I said, 'Well, I tell you what. I'll take the lighter over to the hospital.' See they'd already informed me he'd gone to the hospital. I said, 'I'll take it over there.' I'd find out if it was his lighter which was at the back of the house, and that way I'd determine where he was at the time of the explosion. And so just as I reached down and picked up the lighter and shut the lid on the lighter, and just what you might say, I don't know whether you'd say one second or two seconds. Just the instant, right afterwards the

prettiest blue flame you ever saw shot right across the bottom of the baseboard. Looked like it shot right out of the kitchen. And when it did that, just all over everywhere. In other words Elmer and I were standing in a fiery furnace, just right in the middle of fire. Just blinking fire that, like a neon sign. I'll never forget it as long as I live.

' D. 59 What color was it? A. Well, it was the prettiest bluish, just looked like this—red and blue mixed in with it, too.

"D. 60 Now at the time you, at the instant you saw this blue flame, where was the cigarette lighter? A. In my hand, left hand.

"D. 61 Left hand? A. Yes sir.

"D. 62 Did you have anything on top of it? A. Had my notebook.

'D. 63 Had your notebook on top of it? A. I was fixing to go make some more notes. Just a second, and I was going to put it in my coat pocket, but I didn't have time.

\* \* \* \* \* \*

"D. 65 Where were you standing in reference to the kitchen and how far were you from this stove that had the open fire in it? A. Well, it was just about, oh, it ain't no, over four or five feet, because the cook stove set—this could be the partition here. The cook stove set right here, and Elmer standing here and I's standing here, and I was in the doorway of this bathroom and Elmer here, just standing just out the door, and which, the partition right here and that cook stove right there. Just right at it. In other words, just both entries came right together.

"D. 66  You were about four or five feet from this open fire?  A. Yes sir.  Right there at it."

C. W. Hays, Assistant Chief of the Fire Prevention Bureau who arrived following the second explosion, testified that when he entered the bathroom he detected a slight odor of natural gas, and on holding his hand over the commode pipe he could feel a pressure and that one of the defendant's servicemen put a rag in the pipe to stop the escaping gas.

Chief Mike Quinn, who arrived on the scene about 10:30, testified that sewer gas explosions would not occur "30 or 40 minutes or an hour apart," and that natural gas was odorless; that an Ordinance of the City of Chattanooga required the defendant to odorize its gas so that it could be detected, but that when he entered the building he did not detect the odor of natural gas; that when he entered the building two of defendant's servicemen were there, and that one of them remarked, "This is not natural gas."  Quinn said that on reaching the bathroom he knelt down over the open commode pipe where he detected the odor of natural gas, and that holding his hand over the pipe he could feel a pressure therefrom; that he then told the two servicemen, "I don't care what anybody says, its natural gas," and that one of them then replied, "We are not kidding the Chief, it is natural gas, its our gas."  Quinn further testified that there was a difference in the odor of natural and sewer gas, and that he knew this difference; that escaping gas traveled underground to a point of least resistance.  He further testified that the ground around the place where the gas was escaping was contaminated; that a family living next door had to move out of their home, and that the escaping gas had traveled underground to the basement of a church nearby.

██ It appears from the evidence introduced on behalf of the defendant that the leaks in the main were of long duration as "might have been a year or two, seeping a small amount of gas," but there was no proof adduced by the defendant as to when the main was last inspected for defects or escaping gas. The inspections of the defendant's mains, according to its Vice President, were done by the Southern Forestry Company, of Atlanta, under a contract with the defendant, and inasmuch as there was no proof by the Forestry Company as to when the last inspection of the main was made, it was not unreasonable for the jury to find that the defendant had been negligent in not discovering the leaks prior to the explosions.

██ While not an insurer, the defendant was under a duty to use reasonable diligence in the inspection of its pipes, mains and connections, and the fact that the leaks from which the gas escaped could have been discovered by the exercise of reasonable diligence previous to the explosions was sufficient, under the circumstances, to charge the defendant with negligence. Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App. 648, 69 S. W. (2d) 914; 38 C. J. S., Gas, Sec. 42(b), p. 733; 24 Am. Jur., Sec. 26, p. 683. Furthermore, under the doctrine of res ipsa loquitur, the explosions having been proved and the origin having been established as gas escaping from a main under defendant's exclusive control, the burden shifted to the defendant to show freedom from negligence. 24 Am. Jur. Secs. 59, 60, pp. 701, 702.

In Cleveland Gas Co. v. Woolen, 30 Tenn. App. 282, 205 S. W. (2d) 754, 757, this Court, quoting from C. J. S., said:

" 'In an action for injury resulting from an escape or explosion of gas, the burden of proof rests on

plaintiff to prove the facts constituting his cause of action. Hence plaintiff must prove that the cause of the injury was escaping gas, that such gas belonged to defendant company, that it escaped through the negligence of the company, that it accumulated in the place where the injury occurred, and that defendant's negligence proximately caused the damage. *It is not necessary, however, for plaintiff to show how the gas became ignited.'* (Emphasis supplied.) 38 C. J. S., Gas, Sec. 47c(1), [p. 745].''

■ After a careful review of the record, we have concluded that the evidence adduced substantially meets the foregoing requirements, and the above assignments are accordingly overruled.

■ Next it is urged (1) that the plaintiff was performing his official duties as a Fire Marshal for the City of Chattanooga when he entered the building to investigate the origin of the first explosion, and that he necessarily assumed the risk incident to his duties, and (2) that he was guilty of contributory negligence. In this State the doctrine of assumption of risk is limited in its application to cases of master and servant, "but one frequently finds in opinions of the courts the expression 'assumption of risk' as the practical equivalent of the term 'contributory negligence'.'' Bouchard & Sons v. Keaton, 9 Tenn. App. 467; 2 Tenn. Law Rev. No. 1, p. 41.

■ ■ As previously pointed out, the evidence showed that the plaintiff on arriving on the scene talked to the defendant's serviceman who told plaintiff that he had already made an investigation, had found no evidence of natural gas on the premises, and assured him that he could safely enter the building. Under these circumstances we cannot say that the plaintiff was guilty

of contributory negligence as a matter of law. It is well settled that where the evidence is in conflict, or, as here, where different conclusions might reasonably be drawn therefrom, questions of negligence and contributory negligence are for the jury. McBroom v. Southeastern Greyhound Lines, 29 Tenn. App. 13, 193 S. W. (2d) 92; Campbell v. Campbell, 29 Tenn. App. 651, 199 S. W. (2d) 931. Likewise, questions of ordinary care and proximate cause are for the jury. Southeastern Greyhound Lines v. Groves, 175 Tenn. 584, 136 S. W. (2d) 512, 127 A. L. R. 1378; Campbell v. Campbell, supra; Fields v. Gordon, 30 Tenn. App. 110, 203 S. W. (2d) 934.

■ Next the defendant contends that the sole cause of the explosions was from the defective plumbing in the bathroom, that had there been a vent through which the gas could have escaped it would not have collected in the building, and that since these conditions were independent and intervening causes over which the defendant had no control, it would not be liable. These matters were for the determination of the jury under proper instructions by the Court, since there was credible evidence from which the jury could find that the defendant's escaping gas was the proximate cause of the explosions.

■ Finally the remaining assignment complaining because the Court refused to charge defendant's request No. 2 will be overruled because the substance of this request was included in the following portion of the Court's general charge:

"It was likewise the duty of the plaintiff, in entering this house to exercise reasonable care and safety for his own protection. If he knew that gas had accumulated in this house, or if by exercise of ordinary care and diligence he should have known that

gas had accumulated in this house and that it was dangerous to go inside this building without first giving the defendant an opportunity to discover the leak and rid the building of the gas fumes, then it was his duty not to enter the house and expose himself to this unnecessary danger, and if you found that the plaintiff knew that there had been a gas explosion in this house and if the plaintiff knew the gas was still accumulating in the house and was subject to further explosions, and if he knew it was dangerous to enter said house or that same would be likely to explode after he got in the house, then the plaintiff assumed a risk by going into the house and voluntarily exposing himself to danger, and the plaintiff would be guilty of contributory negligence by assuming the risk, and the defendant would not be liable in this case.''

To deny a special request, the substance of which has been covered in the general charge, is not error. Carman v. Huff, 32 Tenn. App. 687, 227 S. W. (2d) 780.

It results that all assignments of error will be overruled and the judgment below will be affirmed at defendant's costs.

McAmis, P. J., and Hale, J., concur.