**Randall GOODMAN and wife, Joann Goodman, Plaintiffs-Appellees,**

v.

**BALTHROP CONSTRUCTION COMPANY and City of Lafayette, Tennessee, Defendants-Appellants.**

**No. 81–95–II.**

Court of Appeals of Tennessee,
Middle Section.

Oct. 29, 1981.

Permission to Appeal Denied by Supreme Court Jan. 4, 1982.

Frank D. Farrar, Lafayette, and Solon Fitzpatrick, Carthage, for plaintiffs-appellees.

Daniel L. Wischhof, Finch, McBroom & Porter, Nashville, for defendant Balthrop Const. Co.

James W. Chamberlain, Lafayette, for defendant-appellant City of Lafayette, Tennessee.

## OPINION

CONNER, Judge.

The issues presented are whether the jury's verdict is supported by evidence and whether the trial judge correctly excluded from evidence, as an offer of settlement, an exhibit offered by defendant.

The defendant-appellant, City of Lafayette, Tennessee,[1] installed a new water system. Balthrop Construction Company

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

was the contractor. The plaintiffs, Randall and Joann Goodman, paid a tap fee to Lafayette to obtain city water at their home on August 29, 1977. Subsequently, on March 18, 1978, an employee of the city installed the water meter. At that time Mr. Goodman connected his water system to the city's meter and turned on "his end" of the system. Then, Mrs. Goodman informed the city that their pipes were installed and that they were ready for city water service. Subsequent to that call, someone turned on the water at the meter. Plaintiffs, Balthrop and employees of the Lafayette water operation have all denied activating the system.

Thereafter, on April 14, 1978, after the system had been in use by the Goodmans for some three weeks, their son discovered a large amount of water in the house. Investigation revealed that the water was coming from under the kitchen sink. Excessive water pressure had built up in the plaintiffs' system causing the water filter to blow off the pipe allowing the water to escape. Neither defendant had pressure tested the water coming into the plaintiffs' system.

Plaintiffs brought this negligence action seeking $40,000.00 in damages contending that the city and/or Balthrop caused the water to be wrongfully piped into the system prematurely. Defendants disclaimed liability averring that they had no knowledge of, or participation in, the activation of city water service at the Goodman residence. The jury found in favor of the plaintiffs against the city in the sum of $18,500.00 and absolved Balthrop. The city appealed.

Though defendant raises four issues all save one can be resolved by determining whether there is any evidentiary basis to support the verdict. This record reveals substantial proof by the plaintiff which, if believed, would render the city liable.

Mrs. Goodman said that she did not turn the water on at the meter. She testified:

Q. (by Mr. Farrar) All right. Now, had the Mayor told you anything—the Mayor at that time of the City of Lafayette—told you or made any statements to you all about to turn on or to not turn on the water at the meter?

A. No. Uh-uh. He told us not to turn it on. To call them when we got our work done.

Q. All right. Did you get your work done?

A. Yes, we did.

Q. And after that, did you see if you had any city water? Did you open the valves in your line?

A. Yeah. In our lines we did.

Q. And did you have any city water?

A. No, sir, we didn't.

THE COURT: You have to open the valves in the meter, too. Not your line. Your lines are already open. Now, when you get to the meter, you can turn it on and off at the meter, can't you, with what we call one of those keys. She doesn't know—now you're asking her—now, he will know all about that. No use fretting around here with that with this lady.

Q. (by Mr. Farrar) Did you turn on the water at the meter?

A. No.

Q. Have you ever gone out there and turned on anything around the meter?

A. I don't know anything about a meter.

Q. All right. Have you ever seen your husband go out there and turn on anything around the meter?

A. No, sir, I haven't.

Mr. Goodman likewise denied any knowledge of how the city water was activated. He explained that he connected his pipes into the meter but did not turn on the city water.

Q. (by Mr. Farrar) Okay. You hooked in on this end. And this valve right here lies on the other side of the meter?

A. Uh-huh.

Q. All right. It has a place for a lock or some apparatus of that nature. So then the City valve lies on the other side of yours; right?

A. Yes.

Q. On the other side of the meter, in fact. When you ran your line to the meter, did you have your valve open or shut, when you first ran it?

A. I had it shut.

Q. All right. When you ran it to the water meter, do you know whether or not the meter was on as far as letting the water come through it?

A. No, it was not.

Q. It was not?

A. No.

Q. How do you know?

A. Because I opened—after I got all mine ready, I turned the valve under the house to cut my well water off, and then opened the valves for the city water. Not on this. But the valves that I put in myself.

.    .    .    .    .

Q. When you turned the water on as far as your valves, did you get any water?

A. No.

Q. All right. What did you do when you didn't get any water from the City?

A. I turned the valves back off. Turned my well back on. And told my wife to call City Hall, and tell them to come and turn the meter on.

Q. Turn the meter on. All right. And later on did you try your water to see if it was on?

A. Yes. The next day or two I tried it. And it was on. So I cut my well off, and turned it on the city water.

Q. Now, prior to that time had you talked with the Mayor, and had he informed you not to turn the City part of your water on?

A. Yes.

Q. And did you leave it off like he had informed you or instructed you?

A. Sure did.

An employee of the city, James Lamb, said that the work order for the plaintiffs' water meter was written by Angie Hoskins, the city's utility clerk. He said that the order directed him to "Turn on" and "set meter." However, Mr. Lamb later testified that the order only directed him to "set"

the meter and that he did not activate it. Mrs. Hoskins said that she did not remember getting any information from the Goodmans that their pipes were hooked into the system. Someone had to turn the water on and the jury simply had to determine who to believe on that question. Having observed the witnesses and had the opportunity to weigh their credibility by their verdict the jury obviously believed the plaintiffs. The trial judge sitting as the thirteenth juror approved that verdict.

This court has no right to weigh the evidence in a jury case, but must indulge every reasonable inference in favor of the plaintiff when there is material evidence in support of a plaintiff's verdict. *Houser v. Persinger*, 57 Tenn.App. 401, 405, 419 S.W.2d 179, 181 (1967). Our duty upon review of conflicting evidence in a jury trial is not to determine where the truth lies, but only to determine if there was any material evidence to support the verdict below. *Davis v. Wilson*, 522 S.W.2d 872, 875 (Tenn. App.1974); *Chattanooga Gas Co. v. Underwood*, 38 Tenn.App. 142, 149, 270 S.W.2d 652, 655 (1954). Even if we would have reached conclusions different from those reached by the jury, if there is some material evidence to support their verdict, it must be affirmed. *Davis v. Wilson, supra; Chattanooga Gas Co. v. Underwood, supra; Clinard v. Pennington*, 59 Tenn.App. 128, 135, 438 S.W.2d 748, 751 (1968).

On review in this court, we will not weigh the evidence to determine the preponderance thereof, nor decide credibility of witnesses. Rather, our review is limited to a determination of whether there is any material evidence to support the verdict. In so doing we must take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it and discard all to the contrary. We are bound to allow all reasonable inferences to sustain the verdict, and, if there is any material evidence to support the verdict, we must affirm. *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979).

Defendant contends the trial court erred in refusing to admit into evidence an exhibit offered by it. Exhibit # 5 is a two-page estimate of the damage to the plaintiffs' home. The first page was prepared by one Roger Hix, a contractor, on May 12, 1978, to give to the city's insurance company. He estimated the damage to be $1,731.51. The second page was prepared by Mr. Goodman and listed $449.50 in damages supplemental to those of Mr. Hix. Upon proffert by defendant, plaintiffs objected and the estimate was excluded as an offer of settlement.

 Offers of settlement or compromise are not admissible on the issue of liability. E. Cleary, McCormick's Handbook of the Law of Evidence § 274 (2d ed. 1972); D. Paine, Tennessee Law of Evidence § 36 (1974); *Strong v. Stewart*, 56 Tenn. 137, 143–144 (1872).

However, from a review of Exhibit # 5 it is clear that it is merely an estimate of damages prepared by plaintiff and a representative selected by him shortly after the occurrence—not an attempt to settle any claim. Mr. Hix's statement has the word "ESTIMATE" printed in gold face letters across the top of it. Mr. Goodman even refers to the document as an estimate on the second page.

 This estimate is clearly admissible in evidence as an admission by Mr. Goodman that the damage could have been repaired for approximately $4,000.00 at one time instead of the $30,000.00 amount claimed at trial. It is written in part by Mr. Goodman's hand and in part by the contractor that he chose. Such admissions against one's interest are readily admissible. Tennessee Law of Evidence, *supra*, at §§ 54–57. *See Jones v. Lenoir City Car Works*, 216 Tenn. 351, 392 S.W.2d 671 (1965).

We believe the document was admissible not only on the question of actual damages and the credibility of plaintiffs' later claim for a much larger amount than there shown, but also on the question of the plaintiffs' duty to mitigate their damages by early remedial work, an issue that was hotly disputed at trial.

We are unable to agree that this is harmless error, as contended by the plaintiffs. The jury award was $18,500.00. If Exhibit # 5 showing total damages of $2,181.01 shortly after the mishap had been made available to the jury, either on the question of actual damages or on the duty of plaintiffs to mitigate, the ultimate award might well have been substantially less.

Accordingly, we reverse and remand this cause for a new trial solely on the amount to be awarded plaintiffs against the City of Lafayette. It is unnecessary to retry the question of liability since the sole error went to the measure of damages only. The costs are divided equally between plaintiffs and defendant.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

TODD, P. J., and LEWIS, J., concur.