# IN THE COURT OF APPEALS
## AT KNOXVILLE

RONALD STEPHEN SATTERFIELD, ) KNOX CIRCUIT
   SR.,       ) C.A. NO. 03A01-9805-CV-00162
         )
    Plaintiff-Appellee,   )
               )
         )
vs.         )
         )  HON. DALE WORKMAN
         )  JUDGE
         )
GARY LONG and RICHARD M.    )
     SMITH,        )
         )
    Defendants-Appellants. )    AFFIRMED IN PART
               )  REVERSED IN PART
               )  REMANDED

DAVID S. WIGLER, Knoxville, for Appellee.

JOHN KNOX WALKUP, Attorney General & Reporter, WILLIAM J. MARETT, JR., MARY M. COLLIER, Assistant Attorneys General, Nashville, for Appellants.

## O P I N I O N

Goddard, P. J.

This is an action seeking damages for the tort of outrageous conduct.

Plaintiff Ronald Satterfield, a former officer of the Tennessee Public Service Commission (PSC) sued Lieutenant Richard Smith and Captain Gary Long, his former supervisors at the PSC, alleging that they wrongfully caused him to be discharged by purposely manufacturing and reporting false charges against him. Plaintiff also alleged that the Defendants violated his constitutional rights of due process and free speech. The Trial Court dismissed Satterfield's constitutional claims and his claims against the Defendants in their official capacities, leaving only his outrageous conduct claims against the Defendants personally.

These claims were tried before a jury, which returned a verdict against Mr. Long in the amount of $64,000 in compensatory and $40,000 in punitive damages; and against Mr. Smith in the amount of $16,000 compensatory and $10,000 punitive damages. Defendants appeal the judgment entered and Plaintiff cross-appeals the Trial Court's dismissal of his constitutional claims.

We affirm the judgment of the Trial Court relative to Plaintiff's constitutional claims, affirm the judgment for compensatory and punitive damages against Defendant Long, and reverse the judgment against Defendant Smith.

The relevant facts taken in a light most favorable to the Plaintiff are as follows. Plaintiff began his employment as a PSC officer on October 1, 1990. He worked at the Interstate 40-Interstate 75 Scales in Knox County, inspecting commercial tractor-trailers to insure compliance with applicable safety regulations.

On June 18, 1995, he was off duty and watching his daughter play softball, an umpire approached him and asked him for assistance in determining the birth date of a girl playing softball in the league. The umpire, who knew Plaintiff was a state officer, had

suspicions that the girl's parents and coach had falsified a copy of her birth certificate in order to allow her to play in a league for which she was too old.

Plaintiff agreed to help the umpire, called the Tennessee Highway Patrol office, and requested driver's license information regarding the girl. Plaintiff obtained from the Highway Patrol a printout of the driver's license information, which showed that the girl was in fact over the age limit for the softball league in which she was playing.

The next day, June 19, 1995, the girl's father filed a citizen's complaint against Plaintiff alleging that he had misused his authority to obtain the information about his daughter. The complaint was received by Shelton Hunt, who was then manager of transportation services for the PSC. In filling out the complaint form, Mr. Hunt wrote that Plaintiff had been accused of obtaining "a certified copy of an NCIC [National Crime Information Center] report" used to verify the girl's age. Mr. Hunt testified as follows in this regard:

Q: When you were talking to Mr. Smith, you filled out that form, or filled it out shortly thereafter; is that correct?

A: Yes, sir. I think I filled it out. Yes, sir, I had it.

Q: Now, on that form, the language appears NCIC, or certified copy of an NCIC report; correct?

A: Yes, sir.

Q: Where did that language come from?

A: In talking to Mr. Larry Smith.

Q: Did Mr. Larry Smith tell you that an NCIC report had been used to get his daughter disqualified from the softball game?
A: It may or may not have been in those words. I think the words that he actually used was [sic] a certified copy of an official document, and I in turn thought it would be an NCIC report from THP.

At this point, a brief discussion is necessary regarding the difference between the NCIC computer system and the computer system that actually was used, the state driver's license system. The National Crime Information Center (NCIC) system is a federal computer database containing the criminal histories of individuals who have been arrested, as well as outstanding arrest warrants. It is a confidential system. Misuse of the NCIC system, such as was alleged here, is a federal felony carrying a penalty of up to three years in prison.

On the other hand, the state driver's license computer system contains basic information about individuals licensed to drive a vehicle in Tennessee. The information in the state system is a matter of public record, and the undisputed evidence in the record shows that it is readily accessible to anyone who requests it and pays a five dollar fee.

When Plaintiff called the highway patrol, he spoke with Lieutenant Brian Farmer, telling him that he needed the birth date of a young lady. When asked at trial whether he requested that Mr. Farmer use the NCIC computer, Plaintiff responded, "No, sir, I did not. I stipulated specifically not to use the NCIC, that all I needed was a date of birth, no history even on that." Mr. Farmer testified by affidavit that "Officer Satterfield asked for a driver's license check. Officer Satterfield did not ask for an NCIC check."

Thus, Mr. Hunt's assumption that Plaintiff had requested use of the NCIC computer was erroneous. Mr. Hunt directed Defendant Long to investigate the allegations against Plaintiff. On June 26, 1995, Mr. Long interviewed Plaintiff in his office, in the presence of Defendant Smith. Plaintiff testified that he unequivocally told Mr. Long that he did not use the NCIC computer. Mr. Long testified as follows regarding the interview:

> Q: But you didn't care about the difference between NCIC and state computer system?
>
> A: Sir, I wasn't asked to make that determination. I was asked

to take a statement from Officer Satterfield and take a statement from Lieutenant Farmer, I wrote them down exactly like those two individuals told me, I typed it up in my report and I sent it in, and that is the last thing I had to do with anything in that investigation.  I made no recommendations about anything.

Mr. Long's memorandum of the interview, which was sent to Mr. Hunt and up through the

PSC chain of command, states in relevant part:

SUBJECT: Officer Ron Satterfield NCIC Investigation Report of Interview and Officer's Statement

This interview was conducted from approximately 11:30 AM until 12:05 PM at my office at the Knoxville Scales.

In attendance at this meeting was Lt. Richard Smith, Officer Ron Satterfield and myself.

I advised Officer Satterfield of the allegations that he used the NCIC Computer System by requesting and obtaining information from the Tennessee Highway Patrol computer.

Officer Satterfield said he did call Lt. Brian Farmer of the THP and requested a birth date on a girl who was playing in a recreational softball league.

Officer Satterfield said he didn't think their [sic] was anything wrong with requesting the information.  He said he knows of other agencies and he knows some of our officers run information on the PSC computers at the scales for companies requesting information on their drivers and for other reasons he did not specify.

Officer Satterfield said he never meant to cause anyone any trouble and he did not do it with the intent to hurt anyone.

He said he certainly would not have done it if he thought it would jeopardize his job in any way.

He said he is sorry if his actions have caused a problem for anyone involved including Lt. Farmer, the THP or the PSC.

Lt. Smith and I both believed Officer Satterfield to be sincere during this interview.

I advised Officer Satterfield he would be on Administrative Leave with Pay pending the outcome of this investigation.

Mr. Hunt received Mr. Long's memorandum, along with a file containing several other recent memoranda from Mr. Long to Plaintiff, and determined that Plaintiff's employment with the PSC should be terminated. Mr. Hunt testified by affidavit in this regard as follows:

> On June 28, 1995, I submitted a Memorandum on the incident to Gordon Smith, Director of the Transportation Services Division. The memorandum recommended Mr. Satterfield's termination. . .
>
> I received no information from Gary Long or Richard Smith, except what was included in the documents appended to Gordon Smith's Memorandum.

Several memos drafted by Mr. Long regarding Plaintiff's job performance are attached to Mr. Hunt's memorandum to Gordon Smith. One of them, dated July 18, 1995, begins with the allegation that "Officer Satterfield has lost or destroyed the only copies of his former officers [sic] weekly reports."

Mr. Long testified at trial that several of his officers had come to him with complaints that Plaintiff had lost or falsified his weekly reports. He testified that the officers' complaints first came to his attention "around July 18th," after Plaintiff had been placed on administrative leave. There was no other evidence presented at trial tending to support this allegation. In fact, Defendant Smith testified that Plaintiff had always turned in his weekly reports to him on time.

The file on Plaintiff's disciplinary history which Mr. Long sent to Mr. Hunt also contained a memorandum from Mr. Long to Plaintiff, dated June 26, 1995, which states as follows:

> On May 26, 1995 you were scheduled to be in court in Knox County to prosecute the cases you had set for that date.
>
> You arrived to [sic] the courthouse at approximately 8:30 AM

with other PSC Officers.

When court convened at 9:00 AM you were nowhere to be found.

Citation #950096101 (Ray Skinner, Radar Detector) was called by the judge on this date and you failed to appear to prosecute the case. The case was dismissed.

When the judge called your case the other officers in court searched the courthouse for you and determined after failing to find you that you were not in the courthouse.

Plaintiff testified that he was in court on May 26, 1995, and that he appeared for all of his cases which were on the court's docket that day. After he was finished with the cases for which he was to testify, Plaintiff left the courtroom and went to speak with an Assistant District Attorney about another case. At trial, Plaintiff presented the testimony of the Assistant District Attorney and another employee who worked at the courthouse. The testimony of both witnesses supported Plaintiff's assertion that he was in the courthouse on May 26.

Regarding the Ray Skinner case referred to in the above memorandum, the proof shows that Skinner showed up in court on May 26 to contest his citation, without his case being scheduled on the court's docket. After the cases on the docket had been heard, Skinner requested to be heard as a "walk-in" unscheduled case. Since the Skinner case was not on the docket, Plaintiff could not have known that Skinner was going to appear in court that day. After the court determined that the Plaintiff was unavailable to testify on behalf of the state, the Skinner case was rescheduled for a later date. It was not dismissed on May 26 as the memo from Mr. Long to Plaintiff asserts.

Another memorandum in the file sent to Mr. Hunt, drafted by Mr. Long, alleges that Plaintiff claimed 5.5 hours more than he actually worked during the week of May 24, 1995, and states that "I am placing you on probation for a period of three (3) months." This

memorandum is dated June 21, 1995, but also states, "revised June 26, 1995," the date on which Mr. Long interviewed Plaintiff regarding the computer misuse allegations.

At trial, Plaintiff admitted that he had made mistakes in reporting his time worked for May 24 and May 26. He stated that he was confronted by Defendant Long about these errors before the computer incident, and that he "admitted to Captain Long that it was an error on my part because I had plenty of annual time to cover it." Mr. Long gave Plaintiff an oral warning, and Plaintiff was under the impression that the matter was concluded at that point. Plaintiff testified that it "didn't make sense" that he would be retroactively placed on probation for three months after he had been suspended with pay pending the outcome of the computer investigation.

After reading Mr. Long's report and the memoranda contained therein, Mr. Hunt recommended that Plaintiff be terminated. Mr. Long's report and Mr. Hunt's recommendation made their way up the PSC chain of command to Paul Allen, then Executive Director of the PSC. Allen concurred with Mr. Hunt, and his recommendation for termination was followed by the Commission. Plaintiff received his termination letter on August 11, 1995. The termination letter states in relevant part:

> On June 18, 1995, you obtained personal information about another person through the National Crime Computer. You then used this information for personal reasons.

> \* \* \* \* \*

> In making this decision we also took into account your falsification of your 28 day activity report for May 24, 1995, which resulted in your pay being docked for 5.5 hours and your being placed on probation for three (3) months. You were also assigned to be in court on May 26, 1995. When you failed to appear to prosecute the case, it was dismissed. This was negligence in the performance of your assigned duties. Additional recent instances include your losing the only copies of your former

> officers' weekly reports, and your being late for a training session.

Plaintiff appealed this decision to the Assistant to the Finance and Administration Commissioner, who decided that Plaintiff should be reinstated and his discipline reduced to a nine-day suspension without pay. Plaintiff then appealed this decision to the Civil Service Commission. While this appeal was pending, Plaintiff and the PSC settled his grievance by reducing his discipline to a written reprimand which was placed in his record.

After his reinstatement, Plaintiff was reassigned to the Greeneville Scales facility because the Knoxville Scales had been closed for renovations. He was unhappy with his reassignment because it required him to drive a much longer distance to work. He testified at trial that he felt there were closer areas to which he could have been assigned, and that he was being punished by being sent to Greeneville. Mr. Long testified in his affidavit that "Plaintiff's reassignment to the Greeneville Scales was not designed to 'punish and get back at Plaintiff for challenging their termination of him'" and that "the Greeneville Scales were chosen for Satterfield since it was the only location with an available space."

Plaintiff testified that after his reinstatement, Mr. Long's general attitude was "very cold. I sensed venom and viciousness in that man." Plaintiff was not reissued his gun belt, which contained his weapon and handcuffs. A memorandum from Mr. Long to Plaintiff, dated December 28, 1995, states that "your weapon cannot be reissued until our firearms instructor can schedule a time and place to requalify you. This could take some weeks and I believe an officer working without a weapon is safer at a lighted scale complex."

Plaintiff testified that "once I arrived there [in Greeneville], there was no equipment, no paperwork, anything to show me that anyone had even worked in that section of the building with the Public Service Commission. . ." His immediate supervisor

met with him shortly thereafter and gave him some paperwork, but did not provide him with the wheel blocks necessary to properly immobilize the trucks.

Plaintiff testified that he was extremely concerned for his safety without a weapon and handcuffs, and thus with no way to safely arrest anyone should the need arise. Plaintiff described an incident which occurred in Greeneville where he was inspecting a truck and the driver showed him an automatic weapon, and made a joke about Plaintiff being unarmed. Plaintiff entered into evidence a memorandum from the PSC Drug & Alcohol Enforcement Specialist, dated November 15, 1994, which warned of the necessity of always remaining cautious and alert during inspections, stating, "[w]e have had a number of officers assaulted this year. It is important to note that not all the assaults have been by drinking or drug using drivers. It is more important to note, IT CAN HAPPEN TO YOU."

Plaintiff testified that after working "about a week to ten days" in Greeneville without his weapon, the stress and pressure became unbearable and his doctor suggested that he take sick leave. Plaintiff took an extended period of sick leave, during which time he attempted suicide and was hospitalized for two to three weeks. It is undisputed and clear from the record that Plaintiff suffered quite serious emotional and mental injuries.

Plaintiff filed suit against Mr. Long and Mr. Smith on June 25, 1996. As noted above, the Trial Court dismissed his claims against the Defendants in their official capacities, and therefore this appeal involves only the Plaintiff's outrageous conduct claims against them individually. After the jury trial, the judge approved the jury verdicts, which totaled $104,000 against Mr. Long and $26,000 against Mr. Smith.

Defendants appeal, raising the following issues:

1. Whether the trial court erred in holding that plaintiff's lawsuit based upon his termination and allegations of retaliation upon reinstatement was not barred by the exclusive remedy of the Tennessee Civil Service System?

2. Whether the defendants are immune from this lawsuit under the protection afforded state employees under T.C.A. § 9-8-307?

3. Whether the trial court erred in allowing the jury to determine an issue of law, to wit: whether the conduct attributed to defendants was so beyond the bounds of a civilized society that a reasonable person could, upon hearing the facts, exclaim "outrageous"?

4. Whether the evidence of defendants' alleged misconduct was sufficient to support the jury's finding of willfulness, maliciousness, and an award of punitive damages?

5. Whether the trial court erred in holding that it, and not the Tennessee Claims Commission under a claim for Workers' Compensation benefits, had jurisdiction over plaintiff's cause of action?

6. Whether the trial court erred in excluding the testimony of the defendants' psychological expert because she could not point to a sole cause of plaintiff's alleged injury "to a medical certainty?"

Plaintiff in his cross-appeal raises the issue of whether the Trial Court was correct in dismissing his constitutional claims.

Defendants' first argument, that Plaintiff's exclusive remedy for his injuries lies with the Tennessee Civil Service System, rests on their proposition that "[t]he creation of the CSC and its remedies, preempts suits by State employees against their individual supervisors, or against the State." Defendants cite T.C.A. § 8-30-328(k)(4) as support for this preemption argument. T.C.A. § 8-30-328 *et seq.* establishes certain procedural guidelines for regular state employees who wish to file a grievance. Subsection (k) of this statute provides:

> (k)(1) Any regular or permanent state employee may file a grievance within fifteen (15) work days after the receipt of any final performance evaluation on procedural grounds under the provisions of this section.
>
> (2) Grievances filed under this subsection are limited to the provisions of the informal procedure with the final step being the appointing authority.
>
> (3) Employees who are dissatisfied with the appointing authority's decision may submit such decision, with all documentation, to the commissioner for review.
>
> (4) Notwithstanding any law or regulation to the contrary, the decision of the commissioner shall be final and not subject to review.

Nothing in T.C.A. § 8-30-328 *et seq.* mandates or supports the conclusion that a state employee is preempted from filing a cause of action against his or her supervisor, in an individual capacity, for an intentional tort. It is apparent that this statute addresses a situation quite distinct from the present situation. Defendants' first argument is without merit.

Likewise, the Tennessee Workers' Compensation law does not preclude Plaintiff from filing an claim for an intentional tort against a co-employee or a supervisor. The Middle Section of this court so held in the case of Blair v. Allied Maintenance Corp., 756 S.W.2d 267, 270-71 (Tenn.App. 1988), wherein it stated:

> Even though the Workers' Compensation Law limits an injured employee's claims against the employer, it does not place the same limitations on claims against a fellow employee. The Tennessee Supreme Court, relying on Tenn. Code Ann. 50-6-112(a) (Supp.1987), has held that an employee may maintain a common law or statutory tort action against a coemployee who intentionally injures that employee. Taylor v. Linville, 656 S.W.2d 368, 370 (Tenn.1983); Williams v. Smith, 222 Tenn. 284, 435 S.W.2d 808, 811 (1968).
>
> Mr. Blair alleges that Mr. Oakley committed the torts of assault and outrageous conduct. These actions, if proven, are intentional torts. . .After reviewing the record in the light most favorable to Mr. Blair, we have determined that he has alleged two common law causes of action against Mr. Oakley that are not barred by the Workers' Compensation Law.

<u>Blair</u>, 756 S.W.2d at 270-71.

Defendants' second, third and fourth issues are similar in nature and we will address them together. The essence of these issues presents the question of whether the evidence presented, taken in the light most favorable to Plaintiff, is sufficiently egregious that a reasonable person could find Defendants guilty of outrageous conduct. Our review of a properly-approved jury verdict is well-established:

> Of course, in testing the validity of a plaintiff's jury award we must view the evidence in the light most favorable to plaintiff. This court has no right to weigh the evidence in a jury case, but must indulge every reasonable inference in support of the verdict. <u>Houser v. Persinger</u>, 57 Tenn. App. 401, 405, 419 S.W.2d 179, 181 (1967). We must look at all the evidence, take the strongest legitimate view of it in favor of the plaintiff and allow all reasonable inferences in plaintiff's favor. <u>Norman v. Liberty Life Assurance Co.</u>, 556 S.W.2d 772, 773 (Tenn.App. 1977); <u>Truan v. Smith</u>, 578 S.W.2d 73, 74 (Tenn. 1979). Our duty upon review of conflicting evidence in a jury trial is not to determine where the truth lies, but only to determine if there was any material evidence to support the verdict below. <u>Davis v. Wilson</u>, 522 S.W.2d 872, 875 (Tenn.App. 1974); <u>Chattanooga Gas Co. v. Underwood</u>, 38 Tenn. App. 142, 149, 270 S.W.2d 652, 655 (1954). Even if we would have reached conclusions different from those reached by the jury, if there is some material evidence to support the verdict, it must be affirmed. <u>Davis v. Wilson</u>, <u>supra</u>; <u>Chattanooga Gas Co. v. Underwood</u>, <u>supra</u> at 149-50, 270 S.W.2d at 655-56.

<u>Bryan v. Campbell</u>, 720 S.W.2d 62, 63 (Tenn. App. 1986); <u>Mason v. Tennessee Farmers Mut. Ins. Co.</u>, 640 S.W.2d 561, 564 (Tenn. App. 1982).

The standard for determining whether a person's conduct is sufficiently egregious to give rise to liability for the tort of outrageous conduct was set forth in the seminal case of <u>Medlin v. Allied Investment Co.</u>, 398 S.W.2d 270 (Tenn. 1966), wherein the Supreme Court first recognized a cause of action for outrageous conduct:

It is the opinion of this Court that certain factors present in these cases which have allowed an action for mental injury alone outweighed the valid policy consideration against allowing such actions.

These factors are set out in the Restatement of Torts (2d). Sec. 46, "Outrageous Conduct Causing Severe Emotional Distress."

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm."

Clarification of this statement is found in the following comment:

"d. <u>Extreme and Outrageous Conduct.</u> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is `torturous` or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities."

From the foregoing portion of the Restatement, we find the two factors which must concur in order to outweigh the policy against allowing an action for the infliction of mental disturbance: (a) the conduct complained of must have been outrageous, not tolerated in a civilized society, and (b) as a result of the outrageous conduct, there must be serious mental injury.

<u>Medlin</u>, 398 S.W.2d at 274.

Defendants are correct in pointing out that the initial inquiry as to whether a party's conduct could rationally be considered as "outrageous" lies with the court:

. . .the court has the burden of determining, in the first instance,

whether appellees' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether the conduct is such as to be classed as "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities," for which appellees would not be liable.

Swallows v. Western Elec. Co., Inc., 543 S.W.2d 581, 583 (Tenn. 1976). However, in making this inquiry, we must keep in mind that the Supreme Court has noted that

[t]he standards here applicable, i.e., "extreme and outrageous" and "not tolerated in civilized society," are, like "negligence" and other variable standards which are based upon the common sense of the community, primarily for application by the jury.

Moorhead v. J.C. Penney Co., Inc., 555 S.W.2d 713, 718 (Tenn. 1977); Dunbar v. Strimas, 632 S.W.2d 558, 561 (Tenn. App. 1981); Dunn v. Moto Photo, Inc., 828 S.W.2d 747, 753 (Tenn. App. 1991).

Defendants cite T.C.A. § 9-8-307(h) in support of their argument that they are entitled to absolute immunity for their actions in this case. T.C.A. § 9-8-307(h) provides that

State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, *except for willful, malicious, or criminal acts or omissions* or for acts or omissions done for personal gain.

[emphasis provided]. Although Defendants were acting within the scope of their employment during all times relevant to this action, the statute does not provide immunity for "willful" or "malicious" acts.

Our courts have recognized that in order to be considered "outrageous" an actor's conduct must at least be characterized as reckless. See Johnson v. Woman's Hospital, 527 S.W.2d 133, 138 (Tenn. App. 1975) ("A negligent or inadvertent act will not

give rise to a claim of outrageous conduct. . .One is subject to tort liability for severe emotional distress when he engages in outrageous conduct, which conduct intentionally or recklessly causes such severe emotional distress.")  Since T.C.A. § 9-8-307(h) removes immunity only for "willful" or "malicious" acts, our inquiry is whether a reasonable jury could find that Defendants' acts were willful or malicious, and sufficiently egregious to be beyond the pale of common decency and not tolerated in civilized society.

Having carefully reviewed the evidence and the entire record in this case, we are of the opinion that, construing the evidence in the light most favorable to Plaintiff, the jury could reasonably have found that Defendant Long's conduct was "outrageous."  There is an abundance of evidence from which the jury could conclude that Mr. Long's intent was to cause Plaintiff's termination, and that he deliberately filed false and misleading reports to this end.  There is also material evidence from which the jury could conclude that Mr. Long sent Plaintiff to the Greeneville Scales--into a position where Plaintiff would regularly face potential danger without any means to safely make an arrest--as a retaliatory measure after his reinstatement,

As noted above, both Plaintiff and Lieutenant Farmer testified that Plaintiff specifically told Farmer not to use the NCIC computer.  Plaintiff testified that after he was informed of the allegation that he had used the NCIC computer, he emphatically told Mr. Long on several occasions that he did not use that system.  Yet Mr. Long sent a memorandum up the chain of command that clearly implied that Plaintiff had admitted using the NCIC system, which was the offense which caused Plaintiff to be terminated.

When asked on cross-examination whether he "didn't care about the difference between NCIC and state computer system,"  Mr. Long answered, "Sir, I wasn't asked to make that determination."  Mr. Long further testified on this point as follows:

Q: Do you recall testifying at page 152 of your deposition that you weren't concerned about any distinction between NCIC and the state computer system?

A: Well, what I didn't--I don't remember saying that I wasn't concerned about it.

Q: [reading from deposition] QUESTION: That's right. But now there is an important distinction, is there not, between obtaining a confidential criminal record from NCIC, the National Crime Information computer system, and obtaining information that is of public record, a date of birth record that could be obtained by paying the five dollar fee, and an application with the Department of Safety. You would agree there is a difference, wouldn't you? ANSWER: I would say, I would agree there are some differences there, yes, but I wasn't concerned about that.

A: I must have said it if it's in the record, I guess.

Mr. Long admitted on cross-examination that he had testified in his deposition on three separate occasions that he was "positive" that Farmer had told him that he had used the NCIC computer. At trial he testified that "I don't recall [Farmer] saying NCIC information."

Shelton Hunt testified that "it was Gary Long's job to investigate whether the NCIC computer was used." He further testified that Mr. Long informed him that the NCIC computer had been used by Plaintiff:

Q: You didn't do any other investigation besides Gary Long?

A: No, sir. I used the documentation.

Q: So somehow, he communicated back to you the results of his investigation are, NCIC was used?

A: Yes, sir.

Q: And that was false?

A: Well, I found that out at the Level IV hearing; yes sir.

       *        *        *        *

A: I may have talked to him on the telephone, yes, sir, to verify that this is what you have got.

Q: Based on those conversation [sic] you came to believe that NCIC had been used?

A: That's correct.

When Plaintiff's testimony that he told Mr. Long on numerous occasions that he specifically requested Farmer not use the NCIC system, and Farmer's independent testimony, is credited, the conclusion is both rational and inevitable that Mr. Long purposefully reported a serious allegation against Plaintiff which he knew to be erroneous, and which, as a federal felony, was likely to lead to Plaintiff's termination.

Both the content and the timing of Mr. Long's other memoranda in the file sent to Mr. Hunt would support a rational inference that Mr. Long harbored malicious intent toward Plaintiff. As noted above, Mr. Long sent a memo to the Director of the PSC Transportation Division, <u>after</u> the computer investigation was complete and Plaintiff had been placed on administrative leave, which began by flatly stating that "Officer Satterfield has lost or destroyed the only copies of his former officers['] weekly reports." On cross-examination, Mr. Long agreed that he had told the hearing officers at Plaintiff's hearing that Plaintiff "had lost, misplaced, stolen, or something, every report that he was responsible for for weeks on end from the time he had become supervisor during that time." Although Mr. Long alleged that this problem had continued for "weeks on end," there was no written memorandum or documentation of such a problem until nearly a month after Plaintiff had been suspended.

Regarding Plaintiff's weekly officer's reports, there is no evidence in the record other than Mr. Long's testimony that Plaintiff ever failed to turn in a weekly report. Defendant Smith, to whom Plaintiff was responsible for weekly reports, testified that Plaintiff

always turned in his weekly reports to him on time and in satisfactory form.

Mr. Long's memorandum regarding Plaintiff's alleged missed court appearance also contained inaccuracies.  The memo alleges that Plaintiff missed a scheduled court appearance, resulting in a case being dismissed.  Plaintiff's evidence at trial demonstrated that neither of these allegations was accurate.

After Plaintiff was reinstated, he made it clear that he did not want to be sent to Greene County, and that he wished to be assigned somewhere closer to his home.  Mr. Long testified in his sworn affidavit that "the Greeneville Scales were chosen for Satterfield since it was the only location with an available space."  At trial, Mr. Long testified as follows:

Q: Greeneville scales was the only place that    had an
opening for Officer Satterfield when he was reinstated?

A: No, I could have put him in Crossville and I could have put
        him in Cleveland or I could have put him in Greeneville.

Q: Claiborne County?

A: Claiborne County?  I think we just had a road crew working
        in Claiborne County, there wasn't anybody working in a
        set rest area or facility.

Q: You couldn't put him on a road crew?

A: Yes, sir, I could have put him on the road crew.  I talked to
        department of Personnel and told them the situation,
        and they told me I could put him basically anywhere I
        wanted. . .

Mr. Long testified that "I can't say I was real happy about" Plaintiff's reinstatement with the PSC.

Regarding Mr. Long's possible motives, Plaintiff offered several potential explanations for ill will toward him.  Mr. Long admitted that he had testified in his deposition

that he "always felt [Plaintiff] was trying to get him in trouble." Plaintiff also testified about an incident which had occurred shortly before all of the allegations against him arose, wherein he had witnessed a fellow PSC officer, who was married, "engaged in an illicit romantic embrace" with a Department of Safety employee. He reported the incident to the Department of Safety. Plaintiff testified that the fellow officer was "politically connected" and well-liked in the PSC, and that after the incident, he felt that Mr. Long's attitude toward him was "totally different; a coldness, I felt intimidation. . .I was very concerned about my career with the department."

In summary, when the evidence is viewed in the light most favorable to the jury verdict, we are of the opinion that Mr. Long's conduct could reasonably be viewed as outrageous. The jury could have concluded that Mr. Long deliberately filed a report which contained numerous false or inaccurate allegations against Plaintiff, which predictably resulted in him losing his employment. Such an action could reasonably be characterized by the trier of fact as intolerable in a civilized society.

Regarding Defendant Smith, we have carefully reviewed the record for material evidence supporting the verdict and found none. Mr. Smith was not involved in investigating the allegation of computer misuse. He did not participate in the drafting of Mr. Long's memoranda which contained the other allegations against Plaintiff. Viewing the whole record in Plaintiff's favor, perhaps the worst that can be said of Mr. Smith's conduct is that he stood idly by while a higher member of the chain of command, his supervisor, drafted and sent the inaccurate memoranda. This cannot reasonably be construed as outrageous conduct. We reverse the judgment against Mr. Smith.

Defendants raise the issue of whether the Trial Court erred in refusing to allow them to present the testimony of Dr. Susan Justice, a psychologist who was offered to

rebut Plaintiff's assertion that Defendants' actions caused his injuries. It is well-settled that speculative medical testimony is not admissible in personal injury actions, and that expert opinions must be based upon a reasonable degree of certainty. See, e.g., Kilpatrick v. Bryant, 868 S.W.2d 594, 602 (Tenn. 1993); White v. Methodist Hosp. South, 844 S.W.2d 642, 648-49 (Tenn. App. 1992).

Dr. Justice's testimony was presented in an offer of proof to the Trial Court. The only instance where Dr. Justice was asked to provide an opinion to a reasonable degree of medical certainty regarding causation of Plaintiff's injuries is as follows:

> Q: Were you able to determine to a degree of reasonable certainty within your profession with a Ph.D. in psychology, that--is that correct?
>
> A: Yes.
>
> Q: --thank you--that Mr. Satterfield's emotional injury that occurred in January of '96 was proximately caused by events that took place at his workplace?
>
> A: Was I able to determine that?
>
> Q: (nods head.)
>
> A: Not beyond a reasonable doubt.
>
> Q: Why not?
>
> A: Well, I think that is because a lot of what happened with him--and I don't know the truth or falsity of it all, I know what he is claiming happened. It sort of depends on, not just the situation itself but how he perceived that situation. And he may have distorted in his perception--he may have a distorted perception of the events that occurred, so I don't know that, so it's really hard to know whether what happened was a result of--you know, he could have been, even if he distorted his perception of what happened, he still could have been depressed, but then there is more to the story; why would he distort.

The Trial Court disallowed this testimony on the basis that it was speculative and did not

establish a cause of Plaintiff's injuries within a reasonable degree of medical certainty. We agree with the Trial Court. Dr. Justice's testimony establishes only that she could not conclude "beyond a reasonable doubt" that Plaintiff's injuries were caused by his employment. She did not testify to a reasonable degree of medical certainty that his injuries could be attributed to another cause. It was well within the Trial Court's discretion to disallow her speculative testimony.

Plaintiff has cross-appealed the Trial Court's decision dismissing his constitutional claims that the Defendants violated his due process rights. We find that the Trial Court was correct in this regard. Even assuming, without deciding, that Plaintiff was not afforded due process during the hearing and termination proceedings, it is undisputed that neither Mr. Long nor Mr. Smith had any control over these proceedings. The extent of Mr. Long's involvement was to investigate the allegations against Plaintiff and report his findings. The administrative hearings were scheduled and operated by individuals further up the chain of command at the PSC. Mr. Long's role in these proceedings was as a witness only. Further, we note that Plaintiff's constitutional claims are against Mr. Long and Mr. Smith personally and individually. There is no evidence that Defendants, in their personal and individual capacity, acted under color of state law to violate Plaintiff's due process rights, or his right to free speech. We affirm the Trial Court's dismissal of Plaintiff's constitutional claims.

We are of the opinion that under the circumstances of this case, the award of punitive damages was justified. This Court has held that "punitive damages may be awarded against a party who maliciously induces an employer to discharge an employee," Schwab v. Int'l. Ass'n. of Bridge, Structural and Ornamental Iron Workers, 482 S.W.2d 143, 149 (Tenn. App. 1972).

While such an award, which lies within the discretion of the trier of fact, B. F. Myers & Son of Goodlettsville v. Evans, 612 S.W.2d 912 (Tenn.App.1980), is only appropriate under the most egregious circumstances, we conclude that this test has been met in this case and the jury properly exercised its discretion in making the award. Indeed, it would be difficult to conceive of a case where a jury has found a party liable for outrageous conduct to find error because in the exercise of its discretion it found the party also liable for punitive damages.

In conclusion, for the aforementioned reasons, we affirm the judgment awarding compensatory and punitive damages against Mr. Long.  Having found no material evidence supporting it, we reverse the verdict against Mr. Smith.  We affirm the Trial Court's dismissal of Plaintiff's constitutional claims against the Defendants in their individual capacities.  Costs of appeal are adjudged one-half to the Plaintiff and one-half to Mr. Long.  The case is remanded to the Trial Court for collection of the judgment and costs below which are also adjudged one-half against the Plaintiff and one-half against Mr. Long.

_____
Houston M. Goddard, P. J.

CONCUR:

_____

Charles D. Susano, Jr. J.


_____

William H. Inman, Sr.J.